Dunn *v.* Burleigh.

ELBRIDGE G. DUNN *vs.* PARKER P. BURLEIGH and another.
ROBERT SCOTT *vs.* Same.

*Constitutional law. Deed. E. & N. A. Ry. Co.—rights of, under grant from the*
*State. Public Laws of 1872, c. 9. R. S., c. 5, § 7 and c. 98.*

The E. & N. A. Railway Company did not obtain any title to township No.
11, Range 3, in Aroostook county, it being part of the "lands set apart
and designated for settlement" by legislative resolve of 1859, c. 288, and
thus excepted from the grant of the State to this corporation (Special Laws
of 1864, c. 401,); nor does the timber upon that township belong to the rail-
road company, since standing trees pass with the soil, as part of the realty,
unless a contrary intention is clearly expressed, and no such intent appears
in the present instance. Therefore, one who is engaged in cutting and re-
moving the timber upon said township, claiming to act in so doing, under a
permit from the E. & N. A. Railway Co., has no cause of action against the
land agent, and those acting under his orders, who interfere to prevent a
destruction and removal of the timber, and take possession thereof.

But neither the land agent nor those acting under him have any right to
seize and sell, without legal process, the teams, supplies and property of
those engaged in cutting and hauling said timber. The act of 1872, c. 9, as-
suming to authorize such summary proceedings towards alleged trespassers
upon the public lands, is unconstitutional and void.

ON REPORT.

These two cases, requiring but one statement of facts, were sub-
mitted to the court together, to render judgment for the defend-
ants if the actions were not legally sustainable; otherwise, to stand
for trial upon the question of damages. The writs in both suits
were issued the same day, Feb. 7, 1872, and ran against Mr. Bur-
leigh, land agent of the State, and Lewis B. Johnson, sheriff of the
county of Aroostook. Mr. Dunn's declaration was in case, and
Mr. Scott's, in trespass *de bonis*. It was stipulated that they
should be printed with the report, but no copy of them came into
the hands of the reporter. It is apparent, however, that Mr.
Dunn based his claim to recover upon the interference of the de-
fendants with a lumbering operation which he was carrying on

upon Township No. 11, Range 3, in the county of Aroostook, under a permit from the European and North American Railway Company, granted September 26, 1871, for one year; and that Mr. Scott declared upon an unlawful taking of his teams, supplies and property, employed by him in cutting and hauling the timber upon said township, under a contract with Mr. Dunn. It was admitted that on, and prior to, March 24, 1864,—on which day the Special Law of that year, c. 401, authorizing a conveyance of the lands therein mentioned, upon certain conditions, to the E. & N. A. Railway Co., was approved—this township, which is located upon the waters of the St. John river, was the property of the State. The Railway Company completed their road and put it in operation in October, 1871. The plaintiffs relied upon the Special Laws of 1864, c. 401; of 1866, c. 146; of 1868, c, 604; upon deed from the State to the Railway Company dated May 13, 1868, and the permit given to Mr. Dunn on September 26, 1871.

By the first of these acts, § 3, certain State officials were authorized, upon the happening of a stated contingency, to transfer to the Railway Company "all the public lands lying on the waters of the Penobscot and St. John rivers for the uses and purposes set forth in this act. Provided, however, that there shall be excepted from said conveyance, and from the operations of this act all timber, lumber and lands, granted or voted by the present or any preceding legislature, reserving to the State the right to locate such grants within the present year of our Lord eighteen hundred and sixty-four, or within the time or times limited therefor in the several acts or resolves granting the same, all lands heretofore reserved or set apart for public schools, and all lands set apart and designated for settlement under existing laws; and all the lands set apart for the purposes of settlement shall be sold to settlers upon the same terms and conditions by the land agent as is now authorized by law." This act was approved March 24, 1864. By the act of February 21, 1866, c. 146, § 4, the corporation was authorized "to hold timber and lands by grant from the State of Maine in accordance with the provisions of" the preceding act of 1864, and to "sell and

convey the same for the purpose of raising money for the construction of its main line, in mortgage or trust as might be deemed most advantageous."

The last of these three acts was approved March 3, 1868, c. 604. The first section declares that "the governor of the State is hereby authorized and empowered to transfer and convey by deed to the European and North American Railway Company, all the timber and lands belonging to the State situated upon the waters of the Penobscot and of the St. John rivers, to be used by said company to aid in the construction of its line of railway as contemplated and provided" in the acts already cited, "subject to all reservations contained in and the obligations imposed by said acts."

Gov. Chamberlain's deed, made in pursuance of this legislation, recited the authority by which it was given, and conveyed "all the timber and lands belonging to the State situated upon the waters of the Penobscot and St. John rivers" * * * * "subject to all the reservations in and obligations imposed by said acts, except as therein provided; and reservations of land required by law for public uses; then detailing, "by letters, names, numbers and ranges," a large quantity of land, said to be "one million acres, more or less," and concluding with this sweeping clause "and all other lands belonging to the State, whether described or not, situated upon the waters aforesaid." In the *habendum* of the deed was the same reference to the reservations and obligations of the several acts under which it was given.

The defendant introduced Resolve of 1859, c. 288, by which Township No. 11, Range 3, in the county of Aroostook was set apart and designated for settling purposes; the provisions of R. S., c. 5, and of the Public Laws of 1872, c. 9. In 1859, by direction of the land agent, the township in question was surveyed into lots for settlement by Hiram Chapman, Esq., who returned a plan of his survey and lotting into the land office. Prior to the passage of the special act of 1868, c. 604, thirteen of these lots were taken up by actual settlers under the provisions of the settling acts, and certificates had issued therefor; and six of the lots had been actu-

ally conveyed by the State. Subsequently, and before January 11, 1872, when the property of Mr. Dunn, and the timber cut and claimed by Mr. Scott were seized, forty-three more of these lots had been taken up and certificates issued therefor. In operating under the Railway Company's permit the plaintiffs cut indiscriminately upon all the lots within its terms, some of the cutting being upon lots so taken up by settlers who held certificates. In December, 1871, the land agent was informed by a letter from an employee in the land office, dated on the fifth day of that month, "that Dunn's teams, with forty men, are at work on township No. 11, R. 3, on lots for which settlers' notes have been given and certificates granted from the land office;" that Mr. D. claimed the right to cut there under his "permit from the Railroad Company of the township, without any reserve of lots." The correspondent added: "great indignation is felt among the settlers, who protest against having their lots stripped of everything on them." Thereupon the land agent caused this notice to be served upon Mr. Dunn.

"State of Maine Land Office, Bangor, Dec. 25, 1871. Hon. E. G. Dunn,

Sir: Notice is hereby given you that the State of Maine claims title to all the lands heretofore designated and set apart for settlement under existing laws; that township No. 11, Range 3, west from the east line of the State in the county of Aroostook, is claimed to be included within that designation; and that, as land agent, entrusted with the care of said lands, I shall regard all persons who may take or carry away any timber standing or being upon any of said lands, without authority from me, as trespassers and subject to be proceeded against as such by a forfeiture not only of the timber but of the teams, all which are by law made subject to seizure. This notice is given under advice and direction of the governor and council of the State.

PARKER P. BURLEIGH, Land Agent.

January 2, 1872, the executive council "ORDERED, that the land agent be requested and instructed to institute immediate legal pro-

ceedings under section 7, of chapter 5, of the Revised Statutes, to protect the timber lands belonging to the State from any and all persons found unlawfully trespassing thereon, and to take such other legal measures as may be necessary to protect the rights of the State;" which order the governor approved, upon the same day.

In obedience to this order, Mr. Burleigh issued this precept to his co-defendant.

"State of Maine Land Office, Bangor, Jan. 8, 1872."

"To Lewis B. Johnson, Esq., Sheriff of the county of Aroostook, or either of his deputies :

Information having been received at this office that certain persons without legal authority, are and have been engaged in cutting down and taking away trees and timber upon the public lands of the State, in township No. 11, Range 3, west from the east line of the State, in said county, which by law are under the care of the land agent, and being thus trespassers within the provisions of the Revised Statutes of the State, chapter 5, section 7.

You are hereby directed and authorized in behalf of the State, to proceed at once to said township and ascertain the facts and seize all timber, and all shingles made from timber, which you may find so cut from said township, together with the teams, implements, apparatus, and supplies of provisions, or of other articles, used in committing and carrying on such trespass, all of which things, by the provisions of said statutes, are forfeited to the use of the State, and made liable to seizure as aforesaid. The logs you will mark S. M. for the State, and all the other property so seized you will take to some secure place for keeping, and there keep the same safely until further advised by me. You will employ and take with you all necessary aid and assistance requisite for the purpose of making effectual the seizure of said property and the safe-keeping of the same ; and you will promptly report to me all your proceedings in the premises, together with this precept. This done under and in accordance with the instructions of the governor and council.

PARKER P. BURLEIGH, Land Agent."

Dunn *v.* Burleigh.

On the fifteenth day of January, 1872, Mr. Johnson made return, that on the eleventh day of that month, he seized "the following described property then and there used by persons cutting and hauling timber on said township," enumerating the animals, teams and supplies, &c., belonging to Mr. Scott, and then stating that he also seized and marked S. M. twenty-two hundred logs; which were cut and claimed by Mr. Dunn as herein-before stated. February 21, 1872, the articles belonging to Mr. Scott, still in the custody of the sheriff, were appraised by three persons selected and sworn by Judge Downes, under instructions from the land agent; and, on the twentieth day of April, 1872, they were sold at Houlton, by Mr. Johnson, as a licensed auctioneer, under the official direction of Mr. Burleigh, who proceeded in making the sale according to the requirements of the act approved Feb. 16, 1872, c. 9, which is as follows:

"Sec. 1.   Whenever any teams, implements, apparatus and supplies are or shall be seized under the provisions of section seven, of chapter five of the Revised Statutes, the land agent shall cause the same to be sold at public auction by giving notice of the time and place of sale, at least two weeks in some newspaper published in the county where the trespass was alleged to have been committed, and the proceeds after deducting expenses, charges and fees, shall be paid into the State treasury, and an account rendered thereof by the land agent to the governor and council at once."

It was admitted that it had been the custom to a greater or less extent, both in Massachusetts and Maine, to sell and grant timber, and the right to cut timber on the State's lands, distinct from the grant of the soil; particular instances of such sales were to be referred to, though the defendants denied their relevancy.

After the seizure made January 11th, 1872, of the teams, &c., and of the logs, Mr. Dunn discontinued his operations upon the township in controversy.

*Charles P. Stetson* and *J. W. Emery* for the plaintiffs.

I.   The defendants cannot justify under R. S., c. 5, § 7 and laws

of 1872, c. 9, because there was no adjudication of forfeiture, nor
was the property libelled as required by R. S., c. 98, within twenty
days after seizure.    Contrary to the principles of the Magna Charta
and of our Federal and State constitutions, it is sought to deprive
citizens of their property without "due process of law," which
means without opportunity to answer and controvert the charge
upon which their estates are seized and confiscated.    *Saco v. Wentworth*, 37 Maine, 165, 171; *Saco v. Woodsum*, 39 Maine, 358;
*Mayo v. Wilson*, 1 N. H., 56; *Hutchins v. Edson*, 1 N. H., 140;
*Kingston v. Towle*, 48 N. H., 58, 59; *Taylor v. Porter*, 4 Hill,
146–7; *Greene v. Briggs*, 1 Curt. Cir. Ct., 325; *Greene v. James*,
2 Curt. Cir. Ct., 187; *Murray v. Hoboken*, 18 Howard, 372;
*Rockwell v. Nearing*, 35 N. Y., 302; 2 Kent's Com., 13; Cooley's Const. Lim., 352, 354; 3 Kernan, 434.

Public laws of 1872, c. 9, is in violation of the constitution and
void; therefore no justification of proceedings had under it.

II.    This township, lying along the St. John river, passed to the
Railway Co. under the deed to them, made in pursuance of the acts
of 1864 and of 1868.    The defendants say it did not pass because
it had been designated and set apart for settlement under then-existing laws.    What were the enactments in force March 24, 1864,
relative to this subject?    They are found in R. S. of 1857, c. 5,
and public laws of 1859, c. 119; and require, 1st,    That the township in which lands may be selected and offered for settlement must
be located and designated by legislative resolve; 2d,    That the
lands be selected by the land agent from the townships named in
such resolves and advertised by him each year; and, 3d,    That
the lands be surveyed and lotted for settlement under the direction
of a board consisting of the governor, council, state treasurer and
land agent.

The exceptions in this grant from the State to the Railway Co.
should be construed strictly against the grantor.    *U. S. v. Dickson*,
15 Peters, 165; *Darling v. Crowell*, 6 N. H., 421; *Klock v.
Hudson*, 3 Johns., 375; *Jackson v. Gardiner*, 8 Johns., 406; *Jackson v. Blodgett*, 16 Johns., 172, 178.

All the requirements of law, not one or two of them, must have been complied with to bring any portion of the State's land or timber situate upon the waters of the St. John within the exception of the deed. The object of the grant then required that it be liberally construed to accomplish its purpose, which was to aid and secure the building of a great railroad, which this company has built, thereby paying the agreed consideration for the conveyance to them; an ample compensation, which now demands liberality in construing the deed. *Winslow v. Kimball*, 25 Maine, 463.

The legislature had for years been accustomed to "designate and locate" or "set apart" certain *townships*, by letter, number or name, for settlement; therefore we are led to believe that the use of the word *"lands,"* instead of "townships of land" in the exception to the grant is significant, indicating that only such land as had, by a compliance with all the requirements of law, been thrown open to settlers was excepted.

The counsel then entered into an able and elaborate discussion, fortified by many citations of authorities and the phraseology of statutes and resolves relative to settling lands, to show that this was the true construction of the exception.

III. At all events, the timber upon this township passed to the Railway Co.

If there was no intention to convey the timber separate from the lands, in cases where the lands were within the exception of the act of 1864, then there was no occasion nor reason for putting the word *timber* into the statute of 1868 at all.

Trees and timber may be reserved by express *grant* so as to form a distinct estate of inheritance. *Clapp v. Drake*, 4 Mass., 266 : *Adams v. Briggs*, 7 Cush., 367 ; *Putnam v. Tuttle*, 10 Gray, 48 ; *White v. Foster*, 102 Mass., 378 ; *Howard v. Lincoln*, 13 Maine, 122 ; *Kingsley v. Holbrook*, 45 N. H., 322; R. S., c. 71, § 185, and c. 109, and very many other statutes and resolves, &c.

*A. W. Paine*, for the defendants.

The defendants are the land agents of the State, and his servant

or deputy acting under written authority from him, specifying the thing to be done and the reasons for doing it. The law devolves upon the land agent the care of the public lands, including those held for settlement. It is his duty, then, to take all necessary measures to protect them from trespassers and to enforce the laws enacted for that purpose. This duty is enforced by R. S., c. 5, especially by § 7, under which the defendants justify, and under which their proceedings were had.

In resisting the claim of the E. & N. A. Ry. Co. the land agent rendered valuable service to the State ; for more than forty townships and parts of townships, and the whole settlement policy of the State are involved in this question ; giving to these cases an importance and interest not surpassed by any ever presented to this court for decision.

I. The first question is whether or not these lands were, at the time of the alleged trespass, the property of the State ? They were so unless conveyed to the Railway Company by the deed of May 13, 1868, the validity and force of which depends upon the construction given to the acts of 1864, 1866, and 1868 ; and especially to the proviso of the act of 1864, c. 401, § 3 :

"*Provided, however, that there shall be excepted from said conveyance and from the operation of this act* * * * * *all lands set apart and designated for settlement under existing laws.*" This language is so plain that no words can make its meaning more evident ; "the court will not undertake to interpret what is too plain to need interpretation." *Bragg v. Burleigh,* 61 Maine 444.

But we can ascertain its meaning from what is omitted, as well as from what is expressed. A very large number of settlers had taken up lots in various parts of the public domain, and were then at work, performing the conditions of their certificates, in order to earn and receive their deeds. When this act passed there were thirteen settlers upon this township, who had increased to forty-three at the time of the trespass ; and the company's permit is made to extend over some of these lots indiscriminately with those not taken up. With reference to these settlers already upon these

Dunn *v.* Burleigh.

lands, under their contracts with the State, the act is entirely silent except in the reservation cited. This silence can only be accounted for on the ground that the legislature did not intend to give the Railway Company any power over them; but, in exercising the authority given by the act of 1866, c. 146, to mortgage their lands, the company actually make their deed to embrace the lot of every settler, in all these forty or more towns, who had not actually received his deed prior to that time—unless the construction for which we contend is adopted! Can the legislature for a moment be supposed guilty of enacting, not merely such a *folly* but such a *wickedness?*

II. The claim that the timber passed without the land is more absurd, if possible, than the other; resting solely upon the grant of "all lands *and* timber" in the act of 1868, though it is made subject to all reservations contained in the prior acts of 1864 and 1866. Just as though the legislature intended to give the company a perpetual permit to cut timber on the settlers' lots, roaming over their lands at pleasure from one generation to another, without leaving enough for building, fencing or fuel. The settler must clear fifteen acres to entitle him to his deed; how can he do it, without the company's consent, if their claim is well-founded? This township was sufficiently designated for settlement, by Resolve of 1859, c. 288. The reservation then was unconditional. The provisions as to the land agent's proceedings, are directory.

III. R. S., c. 98, was not intended to apply to cases like these, but to those where a forfeiture of personal property is incurred, in which private individuals are interested, as entitled to the whole or a part of it, who can alone institute the proceedings, therein mentioned; or, at any rate, the legislature had a right to provide a different mode of procedure. Whether the act of 1872, c. 9, was constitutional or not, we say that the effect of the forfeiture—i. e., of the illegal act of trespass,—was to devest the owner of his property and to vest it in the State; and upon its seizure the title became absolute, then relating back to the time of the

original trespass. Hence, it is of no consequence whether Mr. Burleigh proceeded legally or not *after* the seizure, so far as these plaintiffs are concerned ; that being entirely a matter between him and the State, as was decided in *E. & N. A. Ry. Co.* v. *Dunn*, 60 Maine, 453. The property was so completely devested from its former owner by the forfeiture and seizure that no subsequent error can make the officer a trespasser *ab initio.* 1 Hill'd on Torts, 123—125 and 221, note ; 2 Ib., 75, 252-3, and 262-3. That the title to property seized relates back to the act which works a forfeiture, see *Clark v. Protection Ins. Co.*, 1 Story Cir. Ct., 109 ; 3 Wheaton, 246 ; 8 Cranch, 398 and 417 ; *French* v. *Rollins*, 21 Maine, 372.

IV. The act of 1872, c. 9, is constitutional. Only *unreasonable* seizures are prohibited, implying that there are some which are reasonable and authorized. Of this kind are those permitted in all States and recognized by all courts, for the protection of citizens against crime and public wrong, and exercised under federal laws, also ; such as for omitting to make a manifest of cargo ; for making a false entry of merchandise ; and, particularly, smuggling, where the goods are sold upon mere advertisement. And persons are taken and carried away in like manner. 106 Mass., 223. The holder of property may so use it as to expose it to the liability of being taken and summarily destroyed. 2 Kent's Com., 339, 340 ; *Cummings v. Perham*, 1 Metc., 555 ; *Com. v. Alger*, 7 Cush., 84-85 ; *Salem v. East. R. R.*, 98 Mass., 443 ; *Blair v. Forehand*, 100 Mass., 139-140 ; *Att'y Gen'l v. M. C.*, 103 Mass., 456 ; *Hutchins v. Van Bokkelin*, 34 Maine, 126 ; 5 Hill, 99 ; 27 Vermont, 149 ; *Morey v. Brown*, 42 N. H., 373 ; Nott's case, 11 Maine, 208.

Besides numerous other statutes authorizing proceedings *in rem*, we will refer to our Pound law, which permits the detention, confiscation and sale of cattle taken *damage-feasant*, simply upon the pound-keeper's certificate and advertisement. The work-house law allows commitments to be made and continued upon overseers' warrants ; paupers are removed from town to town in the same way ; baskets for coal, and weights and measures generally, may

be seized and destroyed, if found not conformable to the statute, and they cannot be made so ; staves, hoops, shingles, &c., &c., are forfeited if not properly packed, surveyed, or branded ; and there is no feature of unconstitutionality about all these proceedings. *McCarthy v. Hinman*, 35 Conn., 53 ; *Happy v. Mosher*, 48 N. Y., 313.

The whole process of collecting taxes is extra-judicial, from beginning to end, but not unconstitutional. *Murray v. Hoboken*, 18 Howard, 272 ; in which it is well said that "Though generally both public and private wrongs are redressed through judicial action, there are more summary, extra-judicial remedies for both." The great mistake is in giving too narrow a scope and meaning to the terms "due course of law" and "by the law of the land." Their true meaning is not "by trial or adjudication of courts," but by the uniform operation of law, which may cast the decision upon any class the legislature may please to designate ; and wherever it is placed, the decision is conclusive and binding. The assessor, overseer, sealer, collector or land agent may be endowed with the power of adjudication ; if only they act under uniform laws, of a reasonable character, their decisions control.

WALTON, J. The principal question is whether the European and North American Railway Company obtained a title to township No. 11, Range 3, by virtue of their deed from the State, of May 13, 1868.

We think they did not. The deed to them is by its own terms made subject to all the reservations contained in the act of March 24, 1864. Special Laws, vol. 9, c. 401. One of the reservations contained in that act, is of "all lands set apart and designated for settlement under existing laws." See section 3 of the act above cited. By a then existing law—to wit, the resolve of April 4, 1859—the township in question was set apart and designated for settlement. Resolves of 1859, c. 288. It is therefore clear that the township in question was not conveyed to the Railway Company. It was expressly reserved. A simple reading of the

deed and the act and the resolve referred to, will make this con-
clusion plain.

Nor do we think the Railway Company obtained a title to the
timber independent of the land. It is true that the timber stand-
ing and growing upon land may be sold,—that is, a license to cut
it and take it away may be granted, when the land itself is not
conveyed. But as standing trees are part of the realty, as much
so as the soil itself, the presumption that they adhere to and pass
with it will prevail, unless a contrary intention is clearly expressed.
With respect to this land we think a contrary intention is not
clearly expressed. On the contrary, the presumption that the
timber was not conveyed, is very much strengthened by a consid-
eration of the purpose for which the land itself was reserved. It
was reserved because it had been designated and set apart for
settlement. Is it probable that the State intended that land
reserved for such a purpose should be stripped of all its timber?
Could the Railway Company have understood that such a result
was intended? We think not. There is nothing in the deed
from the State to the Railway Company, nor in the acts and
resolves of the legislature authorizing it, which in our judgment
will justify such a conclusion. By the unconditional reservation
of the township in question, the timber trees standing upon it
were also reserved, no words being used expressive of a contrary
intention.

But while we thus find no difficulty in determining that neither
the land of township No. 11, Range 3, nor the timber upon it, was
conveyed to the Railway Company, we are unable to find any
justification for the seizure and sale of the plaintiff's property in
the summary manner stated in the report.

The constitution of the United States declares that no State
shall deprive any person of life, liberty or property, without due
process of law. Fourteenth amendment, section one. And while
it may not be safe to undertake to determine in advance what, in
every case, will be deemed due process of law, we feel no hesitation
in saying that in a case like this, where the State undertakes to

confiscate a person's property upon the ground that it has been used in committing a trespass upon the public lands, something more is necessary than an *ex parte* determination and command of the land agent. It will be noticed that the same protection is secured to property as to life and liberty. Will any one contend that it is competent for the legislature to pass an act authorizing the land agent to seize the person of a trespasser upon the public lands, and hang him, or imprison him for life, without any other trial of his guilt than the *ex parte* determination of the land agent himself, and no other authority than his own personal command? Of course not. No more is it competent for the legislature to pass an act authorizing the land agent to deprive a person of his property in such a summary mode; for what is due process of law in the one case must be equally so in the other. In the constitution, life, liberty and property are all grouped together in one sentence, and the same protection which is secured to one is secured to all.

Nor do we think such an arbitrary and despotic mode of dispossessing one of his property is compatible with our own bill of rights. For if the proceeding cannot be regarded as a criminal prosecution, nor a civil suit, it certainly involves a "controversy concerning property"; and in such a case the constitution guarantees the right of trial by jury, unless it can be shown that at the time of the adoption of the constitution a different practice prevailed; and it is believed that no such practice can be shown. Constitution, art. 1, secs. 6 and 20.

Whether the right be tried by the United States constitution or our own, we find it impossible to justify such a summary proceeding against the property of a supposed trespasser as was had in this case.

We do not mean to decide that the property used in perpetrating a trespass upon the public lands, may not be seized and held till judicial proceedings can be instituted to try the right to have it declared forfeited. Nor do we mean to decide that in this case legal proceedings might not have been had under the ninety-eighth

chapter of the Revised Statutes, which provides for libelling and obtaining a judgment of condemnation of personal property which is claimed to be liable to forfeiture. All we mean to decide is that the seizure and sale of the property of a supposed trespasser upon the public lands, without any other authority or proceedings whatever than the command of the land agent, is illegal ; and that any statute authorizing such a summary proceeding is, to that extent, unconstitutional and void.

The plaintiff, Scott, is therefore entitled to recover ; and the action must stand for trial for the assessment of damages, as stated in the report.

The plaintiff, Dunn, having no interest in the property seized, and suffering no other damage than the interruption of his business, which, for the reasons already stated, he had no right to pursue, cannot maintain his suit against the defendants, and judgment must be rendered in their favor.

*Judgment accordingly.*

APPLETON, C. J., CUTTING, DICKERSON, BARROWS and PETERS, JJ., concurred.