C. C. WAUD, Appellee, v. ED CRAWFORD, Appellant.

Animals: DESTRUCTION: CONSTITUTIONAL LAW: ACTION FOR THE PRICE:
1   BURDEN OF PROOF: EVIDENCE. Code Section 2339, in so far as it authorizes sheriffs and certain other officers to destroy horses and other animals disabled by some disease not contagious or infectious in character, and whose value is not entirely destroyed thereby, is unconstitutional and void, because failing to provide notice to the owner, an opportunity to be heard and compensation for its destruction; and where an officer destroys an animal under the provisions of this section he has the burden of showing that it was worthless and unfit for use to defeat an action for its value. In the instant case the evidence is held to show that the animal was not destroyed because afflicted by a contagious or infectious disease, but because disabled from another disease.

Same: EVIDENCE OF VALUE. Even though the animal in question had
2   no regular market value, a witness familiar with the usual sale price of such animals was competent to testify to its value. Evidence held sufficient to take the issue of value to the jury.

Same: MEASURE OF DAMAGES. In an action for the value of a horse killed
3   by an officer because disabled, the measure of damages is the actual value of the animal, irrespective of any punishment of the officer.

*Appeal from Polk District Court.*—HON. HUGH BRENNAN, Judge.

SATURDAY, JUNE 7, 1913.

ACTION at law to recover the value of a horse killed by the defendant. Defendant pleaded that he was a regular police officer of the City of Des Moines, and also a regular police officer of the Iowa Humane Society, and that in virtue of his authority as such he killed the horse in question, after he had been examined by two veterinary surgeons and pro-·  nounced "disabled and unfit for further use;" for the purpose of ending his suffering. Plaintiff demurred to defendant's answer, and his demurrer was sustained. Thereafter defendant answered, admitting the killing of the horse, and pleading that he was of no value. He also repleaded the statute of limitations. He also averred that he killed the animal to relieve it of its suffering and that he did so with good motives and without malice. On the issues last tendered, the case was tried to a jury, resulting a verdict and judgment for plaintiff in the sum of $27.80, and defendant appeals.—*Affirmed.*

*McLaughlin & Shankland,* for appellant.

*VanVleck & Holmes,* for appellee.

DEEMER, J.—As the killing of the horse was admitted, the principal question in the case is the right of the defendant, as a police officer or an officer of the Iowa Humane Society, to destroy the animal. He pleads justification under section 2339 of the Code, which reads as follows: "A sheriff, constable, police officer, officer of any society for the prevention of cruelty to animal, or any magistrate shall destroy any horse or other animals disabled or unfit for further use."

Plaintiff says that this act is unconstitutional in that it does not provide for notice to the owner, or an opportunity to be heard upon the question as to whether or not the animal was "disabled or unfit for further use," and that, in any event, defendant took the chances on being able to prove that the animal was unfit for further use.

While the police power is very broad, and not capable of .exact definition, it is not boundless, and, as a rule, is subject to constitutional limitations.  Property may be destroyed under this power, without notice or opportunity to be heard, and, without compensation to the owner, to prevent the spread of contagious diseases, to stay the progress of a devastating fire, and in other exigencies, where the public needs protection or defense.  Under this power, public nuisances may sometimes be abated; but, in all such cases, the necessity for summary action must exist, and one who would justify on the ground of necessity must be able to convince a jury that the occasion was present which authorized his act.  The section of the Code relied upon is very broad and comprehensive in its terms and seems to proceed upon the theory that disabled animals and those unfit for further use may be summarily dispatched.  The thought of the Legislature, doubtless, was the prevention of cruelty to animals rather than the safety or security of the public health or welfare.

I.  If the animal was inflicted with a contagious disease, which was likely to be communicated to man or beast, doubtless the killing would be justifiable; but the defendant does not so plead, nor does the record tend to show any such state of facts.  Moreover, if the animal had received some injury which entirely disabled it, as for example a broken leg, doubtless an officer might kill it without notice to the owner or an opportunity to be heard.  But nothing of that kind is here shown.  It is true that in one pleading defendant averred that the animal was disabled

1. ANIMALS: destruction: constitutional law: action for the price: burden of proof: evidence.

and unfit for further use, and he introduced testimony to show that the animal was diseased. We here quote therefrom, as follows:

I saw the mare when I first arrived there, and she was in very good condition with the exception of the right front leg, which was swollen to about three times the normal size, within about two inches of the elbow joint, and the skin was all off with the exception of a little piece down on the shin bone. There was a piece of skin there two inches wide. Otherwise it was all off from top to bottom. Her leg was stiff, and she had no use of the knee joint, and I do not think she had any use of the ankle joint, and the toe was worn off where she had dragged it. I have handled horses all my life more or less, always owned from one or two to forty head. There was a very offensive odor coming from the sore on the mare's leg.

Another witness testified:

Her leg was in pretty bad condition. It was pretty badly swollen. The skin was off from about half-way above the knee down to the fetlock on the back and on the side. It was swollen to about three times its natural size. I have seen the mare running loose in the streets, and I have seen him hold her with the halter. I have seen blood and matter coming from this sore running down in the grass. It had an odor which was worse at times than other. . . . I examined the leg carefully. Do not know whether it was what you call proud flesh or not, but there was pus there; the flesh was kind of raw looking. Stuff was dropping off from it; running off in kind of drops. It was kind of a bloody mixture that was running from the sore, and I saw the pus dropping off. It was dropping off on the street there when the horse was grazing on the parking; also I saw pus on the parking across the street and saw the horse there at both places where the pus was on the grass.

A veterinary surgeon testified as follows:

. . . Was called to Ankeny to examine a mare. She was in the possession of Mr. Waud. I examined her on more

than one occasion and went to Ankeny to examine her at the instance of the Humane Society. I found her in a very unsatisfactory condition. Her leg was affected with what is considered an incurable trouble. It is a fungus growth that springs out something like a mushroom and keeps growing; it is hard to control; it is of a cancerous nature. It gave off an odor, and from my knowledge and experience would say that this mare was incurable. My examinations were a week or two apart. There was no change in the condition upon my last examination, and I reported to the Humane Society that the mare was incurable. I was not a state veterinary nor an assistant. I do not know whether I treated this mare when Mr. Kirkendall owned her or not, but I do think that he came to me and told me that he had a mare with proud flesh and I gave him something for it. Q. Do you say that this mare was afflicted with a disease that is incurable? A. Yes, sir; that is what we thought, and that is what my experience has been with such cases. Q. Then you say it was an incurable disease? A. Yes, sir; it was the same as a cancer on a person. There are very few of them cured. I have no memorandum of the examination. I thought everything was settled.

Plaintiff introduced the testimony of a former owner of the animal, who gave the following version of the matter:

. . . I raised the mare from a colt. At the time she was killed she was from ten to twelve years old, as near as I can come to it. Mr. Crawford led the mare out of my barn and took her down the road and killed her. She came out lively with her head up and walked off, and, if a person did not see there was a sore on the leg, they would think nothing was the matter with her. She did not limp to amount to anything. The proud flesh covered the leg from the fetlock up very near to the body on the back part of the leg. She raised three colts. The mare was gentle. She was Hamiltonian and part Norman. . . .

And, from the record, we make the following extracts, from other testimony adduced on the behalf of the plaintiff:

. . . I was at Kirkendall's the day Mr. Crawford took her out of the barn. After they got her out in the road they started on a run with her. I could not notice that she limped. I knew that she had a sore on the leg. I never saw pus dropping from it. The first time I saw her the leg was swelled down over the hoof. She was in good condition. The lump of proud flesh was smaller the day she was killed than when I first saw her. . . . Q. Do you know whether she was better at the time she was killed than she was at the time you first saw her? A. Oh, yes, a great deal. Q. Was she in good condition the day they killed her? A. Yes, sir; nice and slick. I saw the plaintiff drive the mare. I observed her action. Q. How did she travel? A. She was going on a walk, walking off nicely. Q. A fast walk? A. She walked very fast; she seemed to be nice and spirited. She would act playful at times, act as if she were full of life. I remember seeing the horse out there a few days prior to the date of killing of the animal, and it did not act lame that I could notice. I was out there talking to him on the street when he was holding the horse there. I looked at the leg and did not notice anything drop from that sore. If there had been anything dropping from the sore out there in front of my place, I certainly would have noticed it. I noticed her leg very particularly. I never saw her limp. If she had limped, I certainly would have noticed it.

Another witness said:

. . . There was a great change for the better when she was killed. I saw the horse a couple of weeks before, probably a week or ten days before, the time it was killed. There was a great change in her condition at that time compared to the time when Mr. Waud got her. She could use her knee joint at the time she was killed. There was not near so much proud flesh at that time. It was about halfway between the knee joint and the ankle. There was none above the knee. There was a scar there, but it was partly healed over. She had what you might say free use of the knee joint. I saw Waud ride her. I could not say she limped. She was not as free with that leg as the other, but could not say it was a limp. It was a hitch in it, but going down the road fifty yards from you, you would not notice it. Well, I could

not say that it was practically cured, but was as good as anybody could ask for. Everything indicated it would be well soon. I never noticed any pus or anything drop from that sore. She had three colts that father raised and one that died. I think the last colt she had was the year before Mr. Waud got her. We did not breed her after that.

And plaintiff, himself, testified:

She stepped short but did not throw her head up and down like a lame horse; she had a short step with the right front limb. It was in a very bad condition of proud flesh, a very serious chunk of proud flesh; otherwise she was in good health. The day that they killed her she was practically cured, more than this scab would come off practically the same as a bruised toe nail. In a short time this lump would have dropped away and she would have practically been all right. She was a good buggy horse and could trot a mile in *four* minutes. I took her out to Mr. Kirkendall's farm to get out of trouble. . . . I doctored the mare in the yard, would take a knife and cut the proud flesh and make it bleed like a stucked beef right on my own property. As the blood run away, I put the medicine on the top, and the medicine followed the blood there and helped kill the growth, and I cut it with a knife, and the blood would be on the ground like you had butchered a hog. This in the grass was not my horse. . . . I never owned a horse like this before. I never let them get that far. I have doctored them that was very much cut by wires and bruised and large lumps on their shoulders and their necks, but I kept the proud flesh away. . . . I used the buggy whip when I was driving her. The last time I drove her was on June 7th. I drove her to Des Moines. She was fully as heavy when she was killed as when I received her. Plenty flesh enough for any nice neat driving horse. The proud flesh was between the knee and the pastern or fetlock joint. The proud flesh extended above the knee, nearly halfway to the elbow, not as large, but so the disease was there. It did not go quite to the elbow of the horse on the front leg. . . . She had a fabulous growth. The limb was healthy before that knot came there. It was not healthy when there was a sore there. It was a disease that did not injure the general health. The flesh was growing, and this scab in a short time would

have been off; she could walk as well as any horse could walk and handle one leg as good as the other, in pawing and standing where she was fed. I rode her the day they shot her, and she carried me a mile in fifteen minutes, at a square walk, and she could trot a mile in four minutes the very day they shot her. Q. Did she limp at that time? A. No, sir. Q. Was she an animal that was in good spirits? A. Oh, yes. Q. Lively? A. An animal that was perfectly quiet, but she was not lazy. She was a good everyday buggy horse, or saddle horse, as you would like. Q. Did you work her? A. Just to the buggy. Q. Right up to the time she was killed? A. The day they killed her I rode her from Ankeny to Mr. Kirkendall's farm. Q. How far is that? A. About three and one-half miles. Q. How long were you going that three and one-half miles, if you know? A. About seventeen minutes. Q. Did she walk? A. She walked part of the way. She did not walk very much, but she walked a mile Q. Did you time her? A. I timed her for a mile, and then I got her out of the way, that was the object, I let her go. . . . Q. What do you say as to whether there was pus dropping from the sore on this mare's leg? A. There was not any. From proud flesh there is no pus; any veterinary will tell you that. I treated her on my property where I had a stock fence around, a six-foot fence to keep the snow from blowing in.

Aside from the testimony as to value, this is practically the entire record, and from this it is apparent that the animal was not killed because of being afflicted with a contagious or infectious disease, but solely because disabled and unfit for further use. In this connection, we may, with profit, quote section 2534 of the Code Supplement, reading as follows:

Whenever in the opinion of the state veterinary surgeon the public safety demands the destruction of any stock, the same may be destroyed upon the written order of such surgeon, with the consent of the owner, or upon approval of the governor, and by virtue of such order such surgeon, his deputy or assistant, or any peace officer, may destroy such diseased stock, and the owner thereof shall be entitled to receive its actual value in its condition when condemned, to be ascertained and fixed by the state veterinary surgeon and

the nearest justice of the peace, who, if unable to agree, shall call upon the nearest or other justice of the peace upon whom they agree as umpire, and their judgment shall be final when the value of the stock, if not diseased, would not exceed twenty-five dollars; but in all other cases either party shall have the right of appeal to the district court, but such appeal shall not delay the destruction of the diseased animals. The veterinary surgeon shall at once file with the executive council his written report thereof, who shall, if found correct, indorse their finding thereon, whereupon the auditor of the state shall issue his warrant therefor upon the treasurer of the state, who shall pay the same out of any moneys at his disposal under the provisions of this act, but no compensation shall be allowed for stock destroyed while in transit through or across the state, and the word "stock," as herein used, shall be held to mean cattle, horses, mules and asses.

As this section has reference to animals suffering from contagious or infectious diseases, it is manifest that section 2339, upon which defendant relies, has no application to such diseases and that it covers disabled animals unfit for further use. It may be that the Legislature had in mind horses and other animals disabled by accident, but the term may be broad enough to cover those disabled by disease not contagious or infectious in character. Conceding that this is the proper interpretation of the statute, the courts seem to be agreed upon the proposition that such statutes are unconstitutional and void.

In *Loesch v. Koehler*, 144 Ind. 278 (41 N. E. 326, 43 N. E. 129, 35 L. R. A. 682), the court said:

The confiscation and destruction of the animals cannot be justified as a penalty for the violation of the law against cruelty to animals, as under the statutes of some states, where it is provided that, as a part of the penalty, the property employed in an unlawful trade, an illegal act, may be seized and destroyed. Such statutes are those authorizing the destruction of gambling devices, intoxicating liquors, fish nets, traps, etc. In that class of cases it is not only a part of the

prescribed penalty, but it is held to be a necessary element of and to rest upon a judgment of guilt and of forfeiture. *Hey Sing Ieck v. Anderson,* 57 Cal. 251, (40 Am. Rep. 115) ; *Lowry v. Rainwater,* 70 Mo. 152, (35 Am. Rep. 420) ; *Greene v. James,* 2 Curt. 187 (Fed. Cas. No. 5,766) ; *State v. Robbins,* 124 Ind. 308 (24 N. E. 978, 8 L. R. A. 438). See, also, *State v. Miller,* 48 Me. 576; *State v. Snow,* 3 R. I. 64; *State. Weller v. Snover,* 42 N. J. Law, 341. Though the police power may uphold statutes of that nature, the statute before us does not rest upon the exercise of that power. It does not extend the right as an element of punishment to the owner of the animals killed and wholly omits the essential element of notice, included in the class of cases to which we have referred. Nor can it be maintained that, as an exercise of the police power, it is a method of quarantine, since it does not make the destruction depend upon the existence of infectious or contagious disease, or other conditions affecting public health or comfort. The forfeiture and destruction authorized by the statute are not a part of the penalty for the offense of cruelly using the animals, it is permitted simply because the animals may be injured or diseased past recovery, or, from age, may be useless, and where the owner may have neglected or abandoned them. In *State v. Robbins, supra,* this court said: 'It is fundamental that no person can be deprived of any article, which is recognized by the law as property, without a judicial hearing, after due notice. No degree of misconduct, or wrong, can justify the forfeiture of the property of a citizen, except in pursuance of some judicial procedure, of which the owner shall have notice, and in which he shall have the opportunity to contest the ground upon which the forfeiture is claimed.' In *Kuntz v. Sumption,* 117 Ind. 1, (19 N. E. 474, 2 L. R. A. 655), it was said: 'That notice is required in all cases where individual property rights are involved, and the matter is not one of pure discretion, has been again and again decided by our own and other courts. *Strosser v. Ft. Wayne,* 100 Ind. 443; *Troyer v. Dyar,* 102 Ind. 396, (1 N. E. 728) ; *Jackson v. State* for use of Lindley, 103 Ind. 250 (2 N. E. 742) ; *Johnson v. Lewis,* 115 Ind. 490 (18 N. E. 7) ; *Wells County Com'rs v. Gruver,* 115 Ind. 224 (17 N. E. 290), and cases cited.' In *Lowry v. Rainwater, supra,* it is said: 'Forfeitures of rights and property cannot be adjudged by legislative acts, and con-

fiscations without a judicial hearing after due notice would be void as not being due process of law.' In *King v. Hayes,* 80 Me. 206 (13 Atl. 882), a case involving the exact question before us, it was said: 'We are of opinion that so much of the provisions of Rev. Stat, chapter 124, section 42, as allowed the defendant to condemn, conclusively fix the value of, and destroy the defendant's horse, without any notice, actual or constructive, to the owner, in order that he might be heard, is in violation of the fundamental law, which prohibits any person being deprived of his property without due process of law. *Dunn v. Burleigh,* 62 Me. 24. Such have been the adjudications even in regard to the destruction of intoxicating liquors intended for unlawful sale. *Fisher v. McGirr,* 1 Gray, [Mass.] 1, (61 Am. Dec. 381) ; *Lincoln v. Smith,* 27 Vt. 355.' See, also, *Pearson v. Zehr,* 138 Ill. 48 (29 N. E. 854, 32 Am. St. Rep. 113), where it is held that the slaughter by a live-stock commission of animals supposed to be suffering from contagious disease does not conclude the owner from recovering if it cannot be shown that such animals actually had such disease, and it was said: 'To permit the . '. . commissioners to determine, *ex parte,* that some of a man's horses had the glanders and that others had been exposed thereto, and to hold that determination a justification for slaughtering the horses, without imposing upon the appellants the burden of establishing affirmatively the actual existence of such disease and exposure, would not be a valid exercise of the police power of the state, but would be a palpable violation of the constitutional provision that no person shall be deprived of his property without due process of law.' A like decision was rendered in *Miller v. Horton,* 152 Mass. 540 (26 N. E. 100, 10 L. R. A. 116, 23 Am. St. Rep. 850), and it was there held that in the absence of disease constituting a nuisance the Legislature could not extend the right to slaughter without notice and an opportunity to the owner to be heard. In holding that the statute is invalid in permitting the destruction of the property of a citizen without due process of law, we would not be understood as holding that the question as to the existence of the statutory cause for destruction must be submitted to a court of justice, nor that a notice, such as is required in ordinary civil or criminal proceedings in such courts, is necessary; but some notice and a hearing before some tribunal must be provided. The action of the circuit

court in adding to the terms of the statute, by instructing as to the necessity for notice, it is conceded, could not remedy the omission from the statute.

In addition to the cases cited in this quotation, we refer to the following as announcing the same doctrine: *Jenks v. Stump,* 41 Colo. 281 (93 Pac. 17, 124 Am. St. Rep. 137, 14 Ann. Cas. 914); *Carter v. Colby,* 71 N. H. 230 (51 Atl. 904); *Sahr v. Scholle,* 89 Hun, 42 (35 N. Y. Supp. 97); *Goodwin v. Toucey,* 71 Conn. 262 (41 Atl. 806).

As the law was and is unconstitutional, defendant took the chances of showing that the animal was worthless and unfit for further use. The burden of proof was upon him, and the question, under the record, became one of fact for the jury.

II. It is said that there is no testimony as to value, and that such as was offered was incompetent. As covering this, we quote the following from the record:

Q. Do you know the reasonable market value of horses of that kind in that vicinity at that time? A. Yes, sir. Q. What was it? A. $100 to $125. She was ten or twelve years old when she was killed. . . . Q. As a matter of fact, you do not know what the general market value of mares of that description was in the vicinity of Ankeny at that time? A. I do. Q. You speak of 1904, do you? A. 1904 and 1905 both. Q. You do not know of any that was sold in 1905? A. As I said a few minutes ago, horses of that class are generally a normal price, one year with another, good brood mares of that class. Q. And do you not know of but one mare that was sold about that time and that mare sold for $150 and she had a wire cut? A. I know of others, but I cannot recall them definitely.

*2. SAME: evidence of value.*

The witness was competent and his testimony admissible. See *Nosler v. Railroad Co.,* 73 Iowa, 268; *Scott v. Insurance Co.,* 98 Iowa, 67; *McMahon v. Dubuque,* 107 Iowa, 62; *Houghtaling v. R. R. Co.,* 117 Iowa, 540; *Hamby v. Sampson,* 105 Iowa, 112, and cases cited.

III. By agreement of counsel the trial court instructed the jury orally, and these instructions are complained of be-
3. SAME: measure of damages. cause not fully presenting the issues. The exact points raised here are, that there was not a sufficient instruction as to the value of the animal killed, and that the court was in error in saying that the statute was unconstitutional. Both points are covered, and, while the instructions are not as carefully framed as they would have been, had they been reduced to writing, we find no prejudicial error. The pith of the instructions is found in the following paragraph:

. . . So that the only question that you men have to consider in this matter is: Was the animal of any value? You are not to consider whether he is to be punished because he did an unlawful act. As he viewed it under the statute, it was right, as he viewed it. You are not to consider whether he is to be punished; you are simply to consider from all the evidence before you whether this animal was of any value, as the suit here is for damages to the value of the destroyed property. If you find it was of no value, you will find for the defendant. If you find it was of some value, then you will assess the amount that you so find for the plaintiff. And if you do so find in any amount for the plaintiff, you will add 6 per cent. interest since the 16th of June, 1905, the time the animal was destroyed.

As already indicated, we think this was the question at issue.

We are not as apprehensive, as counsel, over the results of holding the act in question unconstitutional. If an animal be disabled through accident or misfortune, and is manifestly unfit for further use, a police officer, or, doubtless, any citizen, may relieve it from its misery without fear of a successful damage suit; but, if the animal be simply diseased, it does not comport with our understanding of the law to permit any one, whether an officer or not, without notice to the owner or an opportunity to be heard, to be both judge and executioner.

Even in contagious diseases, the owner is entitled to a hearing and also to compensation for his damages, and no less should be given one whose animals are disabled by disease, in the event they are of any real value.

The judgment must be, and it is, *Affirmed.*