CALEB S. MILLER *vs.* HENRY T. HORTON & another.

Bristol. October 25, 1889. — January 1, 1891.

Present: FIELD, C. J., DEVENS, W. ALLEN, C. ALLEN, HOLMES, KNOWLTON, & MORTON, JJ.

*Constitutional Law — Contagious Diseases among Animals — Summary Killing — Compensation to Owner.*

Under the St. of 1887, c. 252, § 13, which authorizes the summary killing of animals having the farcy or glanders, with no provision for compensation to the owner, an adjudication of the cattle commissioners that an animal has the disease is not conclusive; and an order issued by them for killing an animal not in fact infected is no defence to those executing the order in a subsequent action by the owner for compensation. (DEVENS, C. ALLEN, and KNOWLTON, JJ., dissenting.)

TORT for killing a horse. Trial in the Superior Court, without a jury, before *Blodgett,* J., who allowed a bill of exceptions, in substance as follows.

The defendants admitted that they killed the plaintiff's horse, and justified the act by showing that, as selectmen and members of the board of health of the town of Rehoboth, they killed the horse in that town, where the plaintiff resided and kept the horse; and that they did it in obedience to an order, of which the following is a copy:

" November 3, 1888. To Board Health of Rehoboth, Gents: The black geld, left hind foot white, belonging to Caleb Miller of your town and reported to the undersigned as suspected of being infected with a contagious disease, has been examined on this date, and it is adjudged that the animal has the contagious disease known as glanders or farcy. In consequence the animal is hereby condemned, and you are directed to cause it to be killed forthwith, and its carcass safely disposed of by burial. You will also cause the premises where said animal has been kept to be cleaned and disinfected. A reasonable bill for killing and burying will be paid as the statute provides.

" Levi Stockbridge,     } Commissioners on Contagious Diseases
   J. F. Winchester, D.V. }      among Domestic Animals."

It was admitted that J. F. Winchester and Levi Stockbridge were duly appointed members of the board of cattle commis-

sioners.   Winchester testified, that he, with a Dr. Mackie of Attleborough, examined the horse, and decided that it had the glanders; that neither of the other commissioners examined it; and that the foregoing order was thereupon issued and sent to the defendants.

The defendants testified that, on receiving the above order, they went to the plaintiff's premises to kill the horse described; that the plaintiff caused two veterinary surgeons to come and examine the horse, and they decided that it did not have the glanders or any other disease; that they then decided to postpone the killing until they could communicate with Winchester; that about eight days afterwards, in November, they again went to the plaintiff's premises and killed the horse in obedience to that order, the cattle commissioners refusing to modify it.   This was all the justification they offered.

The two veterinary surgeons also testified, against the defendant's objection, that the horse did not have the glanders, or any other disease.

The plaintiff requested the court to rule, as matter of law, that, taking all the evidence in the case as most favorable for the defendants, they had failed to show that their action was authorized by law; and that the statute providing for the killing of an animal affected by a contagious disease was unconstitutional and void.   The judge refused so to rule, but found as a fact, if the evidence of the two veterinary surgeons was admissible, that the horse that was killed was not afflicted with glanders or any contagious disease.

The judge found for the defendants; and the plaintiff alleged exceptions.

The case was argued at the bar in October, 1889, and afterwards was submitted, on the briefs, in November, 1890, to all the judges.

*J. Brown*, for the plaintiff.

*H. J. Fuller*, for the defendants.

HOLMES, J.   This is an action of tort for killing the plaintiff's horse.   The defendants admit the killing, but justify as members of the board of health of the town of Rehoboth, under an order addressed to the board and signed by two of the three commissioners on contagious diseases among domestic animals,

appointed under the St. of 1885, c. 378, and acting under the alleged authority of the St. of 1887, c. 252, § 13. This order declared that it was adjudged that the horse had the glanders, and that it was condemned, and directed the defendants to cause it to be killed. The judge before whom the case was tried found that the horse had not the glanders, but declined to rule that the defendants had failed to make out their justification, and found for the defendants. The plaintiff excepted.

The language of the material part of § 13 of the act of 1887 is: "In all cases of farcy or glanders, the commissioners, having condemned the animal infected therewith, shall cause such animal to be killed without an appraisal, but may pay the owner or any other person an equitable sum for the killing and burial thereof." Taken literally, these words only give the commissioners jurisdiction and power to condemn a horse that really has the glanders. The question is whether they go further by implication, so that, if a horse which has not the disease is condemned by the commissioners, their order will protect the man who kills it in a subsequent suit by the owner for compensation.

The main ground for reading into the statute an intent to make the commissioners' order an absolute protection is, that there is no provision for compensation to the owner in this class of cases, and therefore, unless the order is a protection, those who carry it out will do so at their peril. Such a construction when once known would be apt to destroy the efficiency of the clause, as few people could be found to carry out orders on these terms.

On the other hand, this same absence of any provision for compensation to the owner, even if not plainly founded on the assumption that only a worthless thing and a nuisance is in question, still would be an equally strong argument for keeping to the literal and narrower interpretation. If the Legislature had had in mind the possible destruction of healthy horses, there was no reason in the world why it should not have provided for paying the owners. Section 12 does provide for paying them in all cases where they are not in fault, unless this is an exception. When, as here, the horse not only is not to be paid for, but may be condemned without appeal and killed without giving the owner a hearing or even notice, the grounds are very

strong for believing that the statute means no more than it says, and is intended to authorize the killing of actually infected horses only.   If the commissioners had felt any doubt, they could have had the horse appraised under § 12.   Whether an action would have lain in that case we need not consider.

The reasons for this construction seem decisive to a majority of the court, when they consider the grave questions which would arise as to the constitutionality of the clause if it were construed the other way.

Section 13 of the act of 1887, by implication, declares horses with the glanders to be nuisances, and we assume in favor of the defendant that it may do so constitutionally, and may authorize them to be killed without compensation to the owners. But the statute does not declare all horses to be nuisances, and the question is, whether, if the owner of the horse denies that his horse falls within the class declared to be so, the Legislature can make the *ex parte* decision of a board like this conclusive upon him.   That question is answered by the decision in *Fisher* v. *McGirr*, 1 Gray, 1.   It is decided there that the owner has a right to be heard, and, further, that only a trial by jury satisfies the provision of Article XII. of the Declaration of Rights, that no subject shall be deprived of his property but by the judgment of his peers, or the law of the land.

In *Belcher* v. *Farrar*, 8 Allen, 325, 328, it was said: " It would violate one of the fundamental principles of justice to deprive a party absolutely of the free use and enjoyment of his estate under an allegation that the purpose to which it was appropriated, or the mode of its occupation, was injurious to the health and comfort of others, and created a nuisance, without giving the owner an opportunity to appear and disprove the allegation, and protect his property from the restraint to which it was proposed to subject it."   See also *Sawyer* v. *State Board of Health*, 125 Mass. 182; *Winthrop* v. *Farrar*, 11 Allen, 398. Of course there cannot be a trial by jury before killing an animal supposed to have a contagious disease, and we assume that the Legislature may authorize its destruction in such emergencies without a hearing beforehand.   But it does not follow that it can throw the loss on the owner without a hearing.   If he cannot be heard beforehand, he may be heard afterward.   The

statute may provide for paying him in case it should appear that his property was not what the Legislature has declared to be a nuisance, and may give him his hearing in that way. If it does not do so, the statute may leave those who act under it to proceed at their peril, and the owner gets his hearing in an action against them.

An illustration, although not strictly an instance, of the former mode may be found in the statute authorizing fire-wards or engineers of fire departments to order houses to be pulled down in order to prevent the spreading of a fire, and making the town answerable to the house owner, except in certain cases in which the house is practically worthless because it would have been burned if it had not been destroyed. Pub. Sts. c. 35, §§ 3–5. No doubt the order would be conclusive in its legislative capacity, or "so far as the *res* is concerned," as is said in *Salem* v. *Eastern Railroad*, 98 Mass. 431, 449, that is to say, that the house should be pulled down. But the owner is preserved his right to a hearing in a subsequent proceeding for compensation. On the other hand, a case where a party proceeds at his peril is when he pulls down a house for the same object without the authority of statute. It is said that if the destruction is necessary he is not liable. But by the common law as understood in this Commonwealth, "if there be no necessity, then the individuals who do the act shall be responsible." *Shaw*, C. J., in *Taylor* v. *Plymouth*, 8 Met. 462, 465. *Philadelphia* v. *Scott*, 81 Penn. St. 80, 87. See *Mitchell* v. *Harmony*, 13 How. 115, 134, 135. This means that the determination of the individual is subject to revision by a jury in an action, and is not conclusive on the owner of the house.

So in *Blair* v. *Forehand*, 100 Mass. 136, where it was held that a statute might constitutionally authorize the killing of unlicensed dogs as nuisances, it was assumed, at page 143, that the question whether the particular dog killed was unlicensed was open in an action against the officer who killed it, and that if he killed a licensed dog he would be liable in tort; in other words, that he proceeded in that respect at his own risk, citing *Shaw*, C. J., in *Tower* v. *Tower*, 18 Pick. 262. It could have made no difference in that case if a board of three had been required to decide *ex parte* beforehand whether the dog was licensed.

In *Salem* v. *Eastern Railroad*, 98 Mass. 431, it was decided, in agreement with the views which we have expressed, that the decision of a board of health that a nuisance existed on certain premises, and the order of the board that it be removed at the expense of the owner, were not conclusive upon the owner in a subsequent action against him to recover the expense, he having had no notice or opportunity to be heard. The general rule is, that a judgment *in rem*, even when rendered by a regularly constituted court after the fullest and most formal trial, is not conclusive of the facts on which it proceeds against persons not entitled to be heard and not heard in fact, although, if the court has jurisdiction, the judgment does change or establish the status it deals with as against all the world, from the necessities of the case, and frequently by express legislation. *Brigham* v. *Fayerweather*, 140 Mass. 411, 413.

It is true that it is said in *Salem* v. *Eastern Railroad* that the board's determination of questions of discretion and judgment in the discharge of their duties would protect all those employed to carry such determinations into effect. The remark is *obiter*, and it is doubtful perhaps, on reading the whole case, whether it means that the determination would protect them in an action for damages, when the statute provides no compensation for property taken which is not a nuisance. To give it such an effect as a judgment merely, would be inconsistent with the point decided, and with *Brigham* v. *Fayerweather*. We are not prepared to admit that a condemnation by the present board under § 13 could be made conclusive in the present action of the fact that the plaintiff's horse had the glanders. See, further, *Holcomb* v. *Moore*, 4 Allen, 529; *Foley* v. *Haverhill*, 144 Mass. 352, 354.

But we are led by the dictum in *Salem* v. *Eastern Railroad* to consider another possible suggestion. It may be said, suppose that the decision of the board is not conclusive that the plaintiff's horse had the glanders, still the Legislature may consider that self-protection requires the immediate killing of all horses which a competent board deem infected, whether they are so or not, and, if so, the innocent horses that are killed are a sacrifice to necessary self-protection, and need not be paid for.

In *Train* v. *Boston Disinfecting Co.* 144 Mass. 523, it was held that all imported rags might be required to be put through a

disinfecting process at the expense of the owner. Of course, the order did not mean that the Legislature or board of health declared all imported rags to be infected, but simply that the danger was too great to risk an attempt at discrimination. If the Legislature could throw the burden on owners of innocent rags in that case, why could it not throw the burden on the owners of innocent horses in this? If it could order all rags to be disinfected, why might it not have ordered such rags to be disinfected as a board of three should determine, summarily, and without notice or appeal? The latter provision would have been more favorable to owners, as they would have had a chance at least of escaping the burden, and it would stand on the same ground as the severer law.

The answer, or a part of it, is this. Whether the motives of the Legislature are the same or not in the two cases supposed, it declares different things to be dangerous and nuisances unless disinfected. In the one it declares all imported rags to be so; in the other, only all infected rags. Within limits it may thus enlarge or diminish the number of things to be deemed nuisances by the law, and courts cannot inquire why it includes certain property, and whether the motive was to avoid an investigation. But wherever it draws the line, an owner has a right to a hearing on the question whether his property falls within it, and this right is not destroyed by the fact that the line might have been drawn so differently as unquestionably to include that property. Thus, in the first case, the owner has a right to try the question whether his rags were imported; in the second, whether they were infected. His right is no more met in the second case by the fact that the Legislature might have made the inquiry immaterial by requiring all imported rags to be disinfected, than it would be in the first by the suggestion that possibly the Legislature might require all rags to be put through the same process, whether imported or not. But if the property is admitted to fall within the line, there is nothing to try, provided the line drawn is a valid one under the police power. All that *Train* v. *Boston Disinfecting Co.* decided was that the line there considered was a valid one.

Still it may be asked, If self-protection required the act, why should not the owner bear the loss? It may be answered, that

self-protection does not require all that is believed to be necessary to that end, nor even all that reasonably is believed to be necessary to that end. It only requires what is actually necessary. It would seem doubtful, at least, whether actual necessity ought not to be the limit when the question arises under the Constitution between the public and an individual. Such seems to be the law as between private parties in this Commonwealth in the case of fires, as we have seen. It could not be assumed as a general principle, without discussion, that even necessity would exonerate a party from civil liability for a loss inflicted knowingly upon an innocent person, who neither by his person nor by his property threatens any harm to the defendant. It has been thought by great lawyers that a man cannot shift his misfortunes upon his neighbor's shoulders in that way when it is a question of damages, although his act may be one for which he would not be punished. *Gilbert* v. *Stone*, Aleyn, 35; *S. C.* Style, 72. *Scott* v. *Shepherd*, 2 W. Bl. 892, 896. See *Fairbanks* v. *Snow*, 145 Mass. 153, 155. Upon this we express no opinion. It is enough to say, that in this case actual necessity required the destruction only of infected horses, and that was all that the Legislature purported to authorize.

Again, there is a pretty important difference of degree, at least, (*Rideout* v. *Knox*, 148 Mass. 368, 372,) between regulating the precautions to be taken in keeping property, especially property sought to be brought into the State, and ordering its destruction. We cannot admit that the Legislature has an unlimited right to destroy property without compensation, on the ground that destruction is not an appropriation to public use within Article X. of the Declaration of Rights. When a healthy horse is killed by a public officer, acting under a general statute, for fear that it should spread disease, the horse certainly would seem to be taken for public use, as truly as if it were seized to drag an artillery wagon. The public equally appropriate it, whatever they do with it afterwards. Certainly the Legislature could not declare all cattle to be nuisances, and order them to be killed without compensation. *Watertown* v. *Mayo*, 109 Mass. 315, 319. *In re Jacobs*, 98 N. Y. 98, 109. It does not attempt to do so. As we have said, it only declares certain diseased animals to be nuisances. And even if we assume that

it could authorize some trifling amount of innocent property to be destroyed as a necessary means to the abatement of a nuisance, still, if in this § 13 it had added in terms that such healthy animals as should be killed by mistake for diseased ones should not be paid for, we should deem it a serious question whether such a provision could be upheld. See, further, *Hutton* v. *Camden*, 10 Vroom, 122; *Hale* v. *Lawrence*, 1 Zabr. 714; *Grant* v. *United States*, 1 Ct. of Cl. 41; *Wiggins* v. *United States*, 3 Ct. of Cl. 412; *Mitchell* v. *Harmony*, 13 How. 115, 134.

For these reasons, the literal, and as we think the true construction of § 13, seems to us the only safe one to adopt, and accordingly we are of opinion that the authority and jurisdiction of the commissioners to condemn the plaintiff's horse under § 13 was conditional upon its actually having the glanders. If this be so, their order would not protect the defendants in a case where the commissioners acted outside their jurisdiction. *Fisher* v. *McGirr*, 1 Gray, 1, 45. The fact as to the horse having the disease was open to investigation in the present action, and on the finding that the horse did not have it, the plaintiff was entitled to a ruling that the defendants had failed to make out their justification.

In view of our conclusion upon the main question, we have not considered whether an order signed by two members of the board, upon an examination by one, satisfies the statute, or whether cases like *Ruggles* v. *Nantucket*, 11 Cush. 433, and *Parsons* v. *Pettingell*, 11 Allen, 507, apply.

*Exceptions sustained.*

DEVENS, J. I am unable to concur in the opinion of the majority of the court in the narrow and limited construction which they give to § 13 of chapter 252 of the Acts of 1887, or in the view expressed of its constitutionality if otherwise construed. That construction holds that no power or jurisdiction was conferred upon the commissioners to order the killing of an animal which they adjudged to be affected by the farcy or glanders unless the same was actually thus infected. It would therefore follow, that in a subsequent proceeding, as in an action against the person who executed the order of the commissioners, if it were shown to the satisfaction of a jury that the animal was

not thus diseased, the owner of the animal would be entitled to recover its value in damages.   In § 12 of the same chapter provision is made for the killing of certain animals upon the order of the commissioners, who are directed to have the same appraised at their fair value, except as provided for in § 13, and provision is made for the payment thereof.   The animals affected by the farcy or glanders, described in § 13, when condemned by the commissioners as such, are to be killed without appraisal; no provision is made for payment therefor, although it is made for the expense of killing.   When the two sections are read together, the fair result appears to be that it was the intention of the Legislature that the right of any servant or agent whom the commissioners employ should rest, not on the fact that the animal is actually affected by the glanders, but upon this condemnation.   The constitutionality of the act must, therefore, be discussed.

The distinction between the exercise of the right of eminent domain and the power to make police regulations, by virtue of which the uses of property may be limited and controlled to the pecuniary disadvantage of the owner, or even property itself destroyed, is well recognized.   Where property is appropriated to the public use, provision must be made for compensation to the owner.   Declaration of Rights, Article X.   But laws passed in the lawful exercise of the police power are not made unconstitutional because no provision is made for compensation to the individual whose property may be affected thereby.   They are passed for the protection of the community against the ravages of fire, the spreading of pestilence, and the prevention of other serious calamities ; and such property is not taken for any use by the public, within the meaning of the Constitution.   The regulations in regard to quarantine, health, fire, and the laws for the abatement of existing and preservation of threatened nuisances, are instances of the exercise of this power.   *Bancroft* v. *Cambridge*, 126 Mass. 438, and authorities cited.   Their validity rests upon the necessity of providing for the public safety, and the individual is presumed to be compensated by the benefit which such regulations confer upon the community of which he is a member, or by which his property is protected.   It is for the Legislature ordinarily to determine how, when, and through

whom this police power is to be exercised, and all rights of property are held subject to such reasonable control as it may deem necessary for the prevention of injury to the rights of others, or for the protection of the public health and welfare. "In the exercise of this power," says Mr. Justice Gray, "the Legislature may not only provide that certain kinds of property (either absolutely, or when held in such manner or under such circumstances as to be injurious, dangerous, or noxious) may be seized and confiscated upon legal process after notice and hearing; but may also, when necessary to insure the public safety, authorize them to be summarily destroyed by the municipal authorities without previous notice to the owner, — as in the familiar cases of pulling down buildings to prevent the spreading of a conflagration or the impending fall of the buildings themselves, throwing overboard decaying or infected food, or abating other nuisances dangerous to health." *Blair* v. *Forehand,* 100 Mass. 136, 139, and authorities. In that case it was held that a law by which any person was permitted to kill an unlicensed dog without any previous adjudication, was within the constitutional authority of the Legislature; and, while dogs have sometimes been said to be entitled to less protection than more necessary domestic animals, they are certainly entitled to as much as a horse sick with an infectious disease, which was alleged to be the animal destroyed by the defendants.

In the case at bar, the animal was killed after an adjudication by the cattle commissioners, by which it was determined that it was affected with the contagious disease known as the glanders, and no provision having been made by the law for payment to the owner in such case, it is contended that the law is wholly unconstitutional; and further, that, even if it should be held constitutional so far as it relates to animals actually infected with this disease, the plaintiff is entitled to show as against these defendants that the animal was not so infected, and to recover from them the value of the animal by reason of the fact that they executed the order of the commissioners.

The contention that the law is unconstitutional so far as animals actually infected are concerned cannot be maintained, unless it is true that every police regulation affecting the use of property or authorizing the destruction of property as dangerous

to the community is unconstitutional except when it provides for payment to the owner. The law is a police regulation; the adjudication was made by a tribunal acting quasi judicially, of the same general character as boards of health, to which large powers have always been confided 'for the abatement of nuisances and the protection of the public health. It was for the Legislature to determine a particular disease to be such that the existence of the animal would be dangerous to public health; and the authorities are numerous and decisive, that for injuries to or diminution of value of property by reason of the operation of a police regulation the owner is not entitled to demand compensation. *Baker* v. *Boston*, 12 Pick. 184. *Belcher* v. *Farrar*, 8 Allen, 325. *Bergin* v. *Hayward*, 102 Mass. 414. *Salem* v. *Eastern Railroad*, 98 Mass. 431. *Taunton* v. *Taylor*, 116 Mass. 254.

In regard to the plaintiff's second contention, it would perhaps be sufficient to say that the defendants acted by direction of a body to which the Legislature lawfully could and did confide the power of deciding whether the animal in question was affected with disease. As an officer is protected by his warrant if it issue from a court having jurisdiction, no matter what previous errors may have been made which led to the issuance of it, so the defendants, who simply executed the decree of a tribunal which was competent to deal with the subject and which the Legislature had created, cannot be made responsible for any error committed by it in its adjudication. *Chase* v. *Ingalls*, 97 Mass. 524. But as I am of opinion that the decision of the commissioners is conclusive, and can lawfully be made conclusive by the Legislature, it would be preferable to state briefly the reasons for this view.

The most frequent application of the police power is in the abatement of nuisances by the intervention of boards of health and similar tribunals. It cannot make any material difference that in these cases property is not always destroyed, and that more frequently the cases are those in which its uses are limited, or particular uses forbidden. The case of *Salem* v. *Eastern Railroad*, 98 Mass. 431, is one, however, in which a valuable embankment was removed and partially destroyed by the order of the board of health of the city of Salem, acting under the Gen. Sts. c. 26, § 8. It was held that an order of the board of health under that statute for the removal was valid, without notice to

the parties interested, or opportunity to them to be heard. The action was brought under § 10 of the same chapter, which authorized the board of health, when the occupant or owner failed to remove the "nuisance, source of filth, or cause of sickness," to remove the same, and made the person who caused or permitted the same liable for the expenses. While it was held that the city might not be able to recover for the expenses thus incurred, (unless it proved all the facts,) if the party had no opportunity to be heard, that none of the findings or adjudications of the board preliminary to the incurring of such expenses were conclusive upon him, and that all facts upon which recovery was sought in such an action were open to be controverted, it was so held upon the ground that, while the judgment might be sustained as a proceeding *in rem*, it could not be made the foundation of ulterior proceedings *in personam*, so as to conclude a party upon the fact involved.

From the nature of the case, where, as under the Gen. Sts. c. 26, § 10, the *res* is an alleged "nuisance, source of filth, or cause of sickness," as an embankment by which running waters are stopped and filth accumulated, or like infected clothes from persons diseased, or rotting and putrescent meats on shipboard or in warehouses, or animals afflicted with contagious diseases, and many other noxious objects, action by boards of health must be prompt and summary. Powers to determine whether these objects should be removed or destroyed are undoubtedly very high powers, and they must of necessity be confided to boards of administration in order that the public safety may be guarded. Although of a quasi judicial nature, they must be exercised often without the delays which necessarily attend formal notices and formal trials; and where adjudications are fairly and honestly made, even if mistakes may sometimes occur, they should be held conclusive so far as the *res* with which they deal is concerned. Certainly no one would voluntarily undertake the heavy responsibilities of a board of health, or, as in the case at bar, of the cattle commissioners, if they were to be made responsible in damages for errors of judgment which they might commit. "Their determination," says Mr. Justice Wells, in speaking of the proceedings of boards of health, "of questions of discretion and judgment in the discharge of their duties is undoubtedly in

the nature of a judicial decision; and, within the scope of the power conferred, and for the purposes for which the determination is required to be made, it is conclusive. It is not to be impeached or set aside for error or mistake of judgment; nor to be reviewed in the light of new or additional facts. The officer or board to whom such determination is confided, and all those employed to carry it into effect, or who may have occasion to act upon it, are protected by it, and may safely rely upon its validity for their defence. It is in this sense that such adjudications are often said to be conclusive against all the world; and they are so, so far as the *res* is concerned. The statute and the public exigency are sufficient to justify the omission of previous notice, hearing, and appeal." *Salem* v. *Eastern Railroad,* at page 449. In those provisions of the statute of which Mr. Justice Wells was speaking, (now with kindred subjects embodied in the Pub. Sts. c. 80,) no provision is made for any appeal from the decision of the board of health adjudicating any objects to be nuisances, sources of filth, or causes of sickness, and ordering the removal or destruction of the same, including, when their order is not complied with, the removing or destroying the same themselves, nor for any compensation to those who may thus lose valuable private rights.

In *Train* v. *Boston Disinfecting Co.* 144 Mass. 523, it was held that the board of health, under the St. of 1816, c. 44, (Pub. Sts. c. 80, §§ 18, 64, 65, 67, 69,) might pass a general regulation ordering a certain class of rags imported into the city of Boston to be disinfected, and the expense of disinfecting to be borne by the owner, even without a hearing; and that it was not competent for the owner of the rags, as a defence to the claim for the charges of disinfection, to show that the rags did not require disinfection, and could not have transmitted disease, although they were of the class covered by the regulation which was made, no remedy by appeal or otherwise for reviewing the action of the board having been provided. The Legislature has power to declare certain things nuisances in themselves. It may provide that these things may be regulated by ordinances or by-laws of the towns, or controlled by their authorities. If the Legislature may declare all imported rags to be nuisances, or cause them to be disinfected, subjecting the owner to the

expenses of the operation, although it might be held by a jury thereafter that they were not infected, which we understand to be conceded, it would seem that it might make such a declaration in regard to all rags which a respectable board deemed to be infected, even if not in fact infected. It may determine when that which is otherwise property may cease to be such. It is not competent for the keeper of intoxicating liquors kept for sale contrary to law to show that this keeping is not in fact a nuisance, when the Legislature has declared it to be one. Rights of property are not, indeed, to be invaded wantonly. If it can be seen that an order or regulation is not intended for the protection of the public health, the prevention of nuisances, or the preservation of public order, and that these are not its real objects, courts should interfere for the protection of the citizen in his property.

Applying these principles to the case at bar, they are decisive. The Legislature has decided that a horse infected with glanders is so dangerous to the public health, whether of other valuable domestic animals or of man, that it should be destroyed on account of its dangerous character, and should cease to be entitled to the usual protection of property. It is not an objection to this law that it has failed to provide compensation to the owner, as the animal is itself, in its view, a nuisance of serious danger to the community. It has empowered a respectable tribunal, with powers similar to those of a board of health, to determine whether an animal is of the class described in the statute. The exigency of the case does not permit, at least in the opinion of the Legislature, of notice, appeal, or other mode of reviewing the decision of such a tribunal. This appears to me a lawful exercise of the police power, and the decision should be held conclusive, in order that the community may be protected, and that those entrusted with the execution of the law may safely assume the responsibilities imposed upon them. The court, therefore, in my opinion, correctly refused to rule that the St. of 1887, c. 252, which repealed the Pub. Sts. c. 90, was unconstitutional. Under the later statute, boards of health have no power to adjudicate upon and kill a diseased animal, although they are required to notify the cattle commissioners of the existence of contagion. The commissioners have the powers of boards

of health as to this subject, which are enlarged by other powers, and any regulations made by them on this subject will supersede those made by the local boards of health. While they are authorized to order certain animals to be killed, which are to be appraised and paid for, an animal affected with the glanders was to be killed without any appraisement, and, as I construe the statute, without any payment therefor; but the commissioners were authorized to pay the owner or any other person a suitable sum for killing the animal.

Some minor objections of the plaintiff may be briefly disposed of, in the view I have taken of the case, that were unnecessary to be considered in the opinion of the majority. The plaintiff objects that there was no sufficient description of the animal to be killed, which is termed a "black geld," in the order of the commissioners; but this, accompanied as it was by a statement of the marks of the animal, left no doubt as to its identity. The plaintiff further contends, that the order of the commissioners was unlawful, as only one acted in the examination of the animal and its condemnation. It was admitted that the two persons who signed the order directing the killing of the animal were two of three cattle commissioners appointed by the Governor under the statute. The testimony of Winchester was that he alone of the commissioners, with a physician, examined the animal, and that thereupon the order was issued. The question whether it was necessary that all or a majority of the commissioners should examine the animal cannot be raised here. No exception was taken to any ruling upon this subject, nor did the court find as a fact whether only one commissioner examined the animal and made the adjudication, nor was it requested so to do. If, however, it is true that Winchester alone examined the animal, and if we assume that it was necessary that a majority of the commissioners should have done so in order to make a legal adjudication, it cannot affect the defendants. They are the selectmen and board of health of the town of Rehoboth, whose duty it is to carry out the lawful regulations of the commissioners. The order addressed to them as such board of health is actually signed by a majority of the commissioners. It purports to state their examination of the animal, their adjudication that it had the contagious disease

known as the glanders, their condemnation of it, and their direction that it should be killed forthwith. An order issued by the commissioners in a matter of which they had lawful jurisdiction would protect the defendants in the performance of it, even if its recitals were not in fact true.

I am authorized to say that Mr. Justice Charles Allen and Mr. Justice Knowlton concur in this opinion.