### STEVENS *v.* BLACK.

1. PUBLIC OFFICERS — STATE VETERINARY BOARD — INSPECTION OF STALLION — STATUTES — MANDATORY DUTY.

> Under 3 Comp. Laws 1915, §§ 14887, 14888, providing that before any stallion should be offered for sale or for public service in this State he should be examined and certified by the State veterinary board, there was no mandatory duty resting upon said board to make such examination until requested so to do by the owner, where the stallion

---

On liability of live stock inspectors, see note in L. R. A. 1915B, 1013.

was not being offered for sale or public service, although it is admitted that he was brought into the State for the purpose of sale.

2. SAME—NEGLIGENCE—LIABILITY—STATUTES.

Where defendant, secretary of the State veterinary board, on his own initiative, and without request from the owner of a stallion, undertook to examine said stallion without notice to the owner and in his absence, although said stallion had not been offered for sale or public service, he exceeded his authority, and, where, by reason of the unusual, violent and unreasonable over-exertion of said horse in said examination, a rupture in his stomach was caused, which resulted in his death, said statute afforded him no protection from liability for the consequences of his action.

Error to Isabella; Hart (Ray), J. Submitted October 15, 1920. (Docket No. 16.) Decided December 21, 1920.

Case by Fred G. Stevens against Judson Black, secretary of the State veterinary board, for the negligent killing of a stallion. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed.

*Alex. J. Groesbeck*, Attorney General, *J. E. Converse* and *H. S. Sweeney*, Assistants Attorney General (*Francis McNamara*, of counsel), for appellant.

*Frank H. Dusenbury, Charles H. Goggin* and *Smith & Hunter*, for appellee.

STEERE, J. Plaintiff recovered against defendant a judgment in the circuit court of Isabella county for wrongfully causing the death of an imported and pedigreed Belgian stallion named "Embatable de Don," claimed to have been the most valuable horse ever taken into that county. The parties kindly stipulated, however, at conclusion of the opening statement.

of plaintiff's counsel, that if the court, as a matter of law, found defendant liable under the stated facts a verdict might be directed in plaintiff's favor for $3,000, and counsel for both parties then requested a directed verdict. After argument the court directed a verdict for plaintiff for the conditionally stipulated amount.

It appears in the record and briefs of counsel undisputed that in the spring of 1919, some time prior to May 9th, plaintiff bought this stallion from a well-known firm located at Lafayette, Indiana, engaged in importing and selling horses, and took him to Mount Pleasant, Michigan, for the purpose of sale. He had employed a groom or keeper named McIsaac, who was in immediate charge of the horse which was stabled in a well-known barn on a principal street of Mount Pleasant. Plaintiff had never offered the horse for sale, or used or offered him for breeding purposes in the State of Michigan, and was absent from Mount Pleasant on May 9, 1919. McIsaac was then at the barn in charge of the horse as a groom, whose only duties were to care for, feed and look after him. The horse was, so far as known, sound and in good condition. On that day he was cared for by McIsaac in the usual way, given his morning and noon feed at the regular time and the usual quantity of water, which he ate and drank with relish. Until after the arrival of defendant at the stable in the afternoon of that day the horse appeared in perfect health and normal in all respects. He was a large, heavy animal of the Belgian draft horse breed, weighing 2,400 pounds.

There was then in force in the State Act No. 256 of the Public Acts of 1911, with amendments, entitled as follows:

"An act to encourage the breeding of horses; to regulate the public service of stallions; to require the registration of stallions, and to provide for the enforcement thereof."

Sections 7 and 8 of said act (3 Comp. Laws 1915, §§ 14887, 14888) are as follows:

"SEC. 7. Every stallion brought into this State from another State or from a foreign country to be offered for sale or for public service shall, before any such sale or use is made, be examined by the State veterinary board or its regularly appointed representative, and certified by said board or its representative that said stallion is free from hereditary, contagious or transmissible unsoundness or disease, and is of good conformation and breed type and suitable to improve the horse stock of the State.

"SEC. 8. Any person, firm, company or association violating any of the provisions of this act shall be deemed guilty of a misdemeanor, and shall upon conviction thereof be punished by a fine of not less than twenty-five dollars nor more than three hundred dollars, or by imprisonment in the county jail not more than thirty days or by both such fine and imprisonment in the discretion of the court."

Not having yet offered the horse for sale or breeding purposes within the State plaintiff had made no application for the examination and credentials required by the act for such purpose.

Defendant Black was a veterinary surgeon and secretary of the State veterinary board. Without any request from or previous notice to the owner, then absent, he appeared at the stable in the afternoon of May 9, 1919, at about 3 o'clock, for the purpose, as he stated to McIsaac, of examining the horse under the law upon that subject, telling him who he was. Although McIsaac had no instructions from plaintiff or previous knowledge upon the subject, he submitted to defendant's statement of what he was authorized officially to do and obeyed his directions. In the course of his examination, for the purpose of "proving the wind" to detect any disease of the respiratory organs, he directed McIsaac to take the horse out and run with him down the street for about

a block or so and back again. He then directed McIsaac to get upon the animal's back and gallop him as fast as he could down the street a block and back again, which was done. Not satisfied with the strenuousness of those tests he caused a light, fast driving horse which was in the barn to be hitched to a light buggy and directed McIsaac to get into the buggy with him and lead the stallion behind. He then drove at a very fast pace down the street several blocks, causing the heavy stallion, weighing 2,400 pounds, to gallop behind for a distance of about 120 rods at an unusual gait and unreasonably fast pace for an animal of his kind and weight.

When taken out for this test the horse appeared in good spirits with his head up and full of life. A short time after being returned to his stall he was found by McIsaac with his head down, trembling and sweating excessively. He called defendant, who was near by, and unsuccessfully endeavored to relieve his condition. Two other veterinaries were called, but the horse grew worse with progressive symptoms of a ruptured stomach, of which he died that evening. An autopsy shortly after his death disclosed a rupture of the stomach from four to six inches in length caused, as plaintiff's counsel stated the proofs would show and the defense assumed as true for the purpose of this case, by the unusual, violent and unreasonable over-exertion for a horse of his weight and kind exacted by defendant ostensibly to test his wind.

Defendant's counsel state, and plaintiff's counsel concede, that the two questions involved in the issue as made and argued are:

"*First.* Was Dr. Black a trespasser in making the examination without the request of the plaintiff and without notice, and

"*Second.* The liability of a public officer in the performance of his official duties."

Upon these propositions counsel for defendant contended that, it being conceded the stallion was brought into the State for the purpose of sale, it was the right and duty of the State veterinary board, under section 7 of the act, to forthwith examine him, without any application or request of the owner therefor, to determine whether his sale or service for breeding purposes would or would not be a benefit to the public; that defendant was, therefore, not a trespasser, but when conducting such examination was lawfully performing a mandatory official duty of a discretionary and judicial nature, to determine by an expert physical examination whether such animal was of the kind and in physical condition entitling him to be certified as the statute provided; and that in the performance of such official duty he was not liable for the result of any mistaken methods adopted in the exercise of his discretion, or judgment.

Upon the liability of a public officer for damage done by him to private property while in performance of a mandatory official duty, many decisions, not entirely harmonious, are to be found. In that connection it may be noted that this act is not bottomed on the impelling necessities which justify those drastic measures authorized by quarantine laws for guarding the life and health of human beings against dangerous, infectious or contagious diseases which are or may become epidemic, neither can it be regarded as fairly analogous to the laws authorizing quarantining or destruction of domestic animals to guard against an epizootic of diseases, infectious or contagious amongst them, from which if unchecked great and immediate public loss would result. Most of the cases to which our attention has been called relate to the conduct of public officers in acting under such laws.

Even in that class of cases the rule of protection in performance of official duty has its limitations. In *Mil-*

*ler* v. *Horton,* 152 Mass. 540 (26 N. E. 100), the court
held in a well-considered opinion written by Justice
Holmes that under a law authorizing summary de-
struction of animals having farcy or glanders, with
no provision for compensation to owner, an order of
commissioners on contagious diseases of domestic ani-
mals certifying that a certain horse examined on that
date was adjudged to have a contagious disease known
as glanders and directing that he be killed, was not
a protection to the officers executing the order in a sub-
sequent action by the owner against them where it
appeared the animal was not in fact infected with the
disease. In *Pearson* v. *Zehr,* 138 Ill. 48 (29 N. E.
854), a like ruling was made in an analogous case
where the livestock commissioners of the State ex-
amined and ordered certain horses destroyed because
infected with glanders.

As illustrative of what is claimed to be generally
accepted rules applicable to the case at bar, counsel
for defendant cite *Garff* v. *Smith,* 31 Utah, 102 (86
Pac. 772), and *Mitchell* v. *Hopper,* 114 Ark. 556 (170
S. W. 231). Those cases involved the performance
of duties under laws directed to the prevention or
eradication of communicable diseases amongst ani-
mals. In the Utah case defendants were the State
sheep inspector and his deputy acting in performance
of their duties as public officers under a law providing
for quarantining sheep found diseased, and were
charged by the owner with having defined the limits
of a quarantine for certain of plaintiff's sheep, which
they required him to observe, in a region where, owing
to the scarcity of proper feed, they ate quantities of
greasewood and drank water excessively, a combina-
tion likely to cause sickness and death amongst sheep,
as a result of which several of them died. Of this the
court said:

"There are no allegations in the complaint, nor is

there any evidence showing, that either of the defendants knew, or that it was common knowledge, that it is harmful or injurious to sheep to eat greasewood and to drink water thereafter, nor that the defendants, in the performance of their duty or otherwise, in defining the limits and designating the place, or in any other particular, acted with malice or wantonness, or that they acted beyond the scope of their authority, or without or in excess of their jurisdiction.  *  *  * It is strongly urged by respondent that, while the act of inspecting and quarantining the sheep may be judicial in its nature, nevertheless the act of defining the place and limits of quarantine is but ministerial. We discern no such distinction. The law does not prescribe the mode of doing the one act any more than it does the other. The law requires the officer to make regulations for the quarantine.  *  *  * It is quite apparent that the doing of the acts complained of involve such discretionary powers as to make their exercise judicial in their nature, and that the officer performing them is not liable in a civil action, in the absence of averments and proof that he acted with malice or through fraud or corruption." Citing cases.

In the Arkansas case, cattle inspectors were engaged in the performance of their official duties under a law requiring inspection and treatment of cattle for eradication of certain diseases, and while so engaged one of them roped and threw a steer in such careless manner, as was claimed, that his leg was broken. The owner brought an action for its value, charging negligence in the manner of roping and throwing the animal, as to which there was an issue of fact, defendants claiming the injury was purely accidental and the animal was properly lassoed by an experienced man when trying to break from the herd, but when it struck the brace of the horse at the end of the rope the steer slipped on a rock and fell, admittedly suffering the injury complained of. Defendant assigned error on refusal of the court to instruct the jury that—

"Before you would be authorized to find for the

plaintiff, you must find from a preponderance of the testimony that the defendants carelessly or negligently roped the steer belonging to the plaintiff, and in so doing broke, or caused to be broken, its leg, and if you fail to so find from a preponderance of the testimony, then your verdict will be for the defendants."

The court instructed the jury that if they "found from the evidence that appellants, during the inspection, injured any of the plaintiff's stock,. they would be liable for whatever damages he sustained by reason of the injury," which the appellate court held was erroneous, and the rejected request should have been given, saying in part:

"Appellants were officers and engaged in the performance of their duties in inspecting the cattle at the time they undertook to do so. The act being lawful they were only liable for injuries resulting from carelessness or negligence and could not be held liable for damages or injury resulting by accident or casualty while they were in the exercise of proper care, or such care as an ordinarily prudent man would have exercised under the circumstances."

Although the case was reversed for the errors pointed out, the proper rule, as stated by the court, seems to harmonize with plaintiff's contention in the instant case, even assuming, as defendant claims, that, under the act in question, it was his official duty to unsolicited and without notifying the owner examine and test the horse on his own initiative.

But back of that question we find nowhere in the act any express provision giving the State veterinary board the power or imposing upon it the duty to, on its own initiative, take possession or control of such a horse against the wishes, or without the knowledge and consent, of its owner and conduct the examination provided for in section 7, especially when it is undisputed that the animal has never been offered for sale or breeding purposes, or so used, within the State.

In that connection it is helpful to note the class of boards to which the State veterinary board belongs. It cannot properly be counted as a health board, for man or beast. Here and elsewhere that field is occupied by boards properly constituted and empowered for such service under different laws. In this State those duties were until recently performed as to domestic animals by the State livestock sanitary commission, created by Act No. 182, Pub. Acts 1885 (2 Comp. Laws 1915, § 7307 *et seq.*), but abolished by Act No. 181, Pub. Acts 1919, which created a department of animal industry providing that all functions, powers and duties of the abolished commission "are hereby transferred to and vested in the department of animal industry hereby created," etc. The State veterinary board is one of the several examining and licensing boards provided for authorizing the pursuit of certain professions and other callings within the State, such as physicians and surgeons, osteopaths, dentists and pharmacists, optometrists, chiropodists, veterinaries, barbers, nurses, horse-shoers, etc. As created, the number of its members, required qualifications, powers and duties of this board are provided in Act No. 244, Pub. Acts 1907 (2 Comp. Laws 1915, § 6813 *et seq.*). The additional powers directly conferred upon said board by the act under consideration are stated in section 6, amongst which it is "authorized to provide for official examination of pedigrees and certificates," etc.

Both by the statute creating it and the act under consideration its purposes, powers and duties are primarily those of an examining and licensing board, from which those desiring to engage in the practice of veterinary medicine in its various branches, or under the act in question, engage in the sale or use of stallions for breeding purposes must, by complying with prescribed requirements, obtain a license there-

for before entering upon those activities, for a violation of which criminal proceedings and punishment by fine and imprisonment are imposed. The law provides no machinery and confers upon the board no power to compel a party who has not engaged in such calling or activity, even though he contemplates doing so, to qualify and obtain a license therefor. It does provide criminal prosecution and punishment if he so engages without a license. Plaintiff violated no law in bringing the horse into the State and keeping him here, though intending to sell him, so long as no "such sale or use is made" before the certificate prescribed by section 7 has been obtained. By the opening statement of plaintiff's counsel it was shown that the board had promulgated certain rules and regulations prescribing the manner in which applications for examination and license should be made, and had circulated them amongst horsemen of the State. If not directly advised, plaintiff presumptively knew the law. Taking as true, and conceded for the purposes of this case, that this horse was of the kind and value stated in counsel's opening it was not only the duty but beneficial right of plaintiff to have him inspected, registered and licensed. Upon this the market value of the horse for the purposes proposed in this State largely depended. To sell or offer him for sale before obtaining the prescribed credentials would not only lay plaintiff open to criminal prosecution but be suicidal as a business proposition.

To a large degree the law is in its nature self-enforcing amongst those capable of qualifying and proposing to engage in the named sale or use of such animals, as a matter of self-interest; and like reasons of self-interest stimulate those who have complied with the law to insist upon its enforcement against those endeavoring to violate it. While the board and its members would naturally and commendably take an active

interest in seeing that this law relating to their duties was enforced, the provided method for reaching that result is prosecutions for its violation.

In the course pursued defendant exceeded his authority and was not in the performance of any mandatory official duty which protected him from liability for the consequences.

The judgment is affirmed.

MOORE, C. J., and BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.