DOMENIC DiMAGGIO *vs.* MYSTIC BUILDING WRECKING CO., INC.

Suffolk.    March 10, 1960. — April 11, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Building.   Administrative Matter.   Boston.   Notice.   Evidence,* Judicial notice.   *Conversion.   Contract,* For demolition.   *Words,* "All materials."

This court took judicial notice of the provisions of St. 1938, c. 479, the Boston building code.   [689]

The owner of a building in Boston had adequate notice of an order to him by the building commissioner under § 116 (d) of the Boston building code, St. 1938, c. 479, to raze the building as unsafe where the order was mailed to the owner at his residence by certified mail and a copy was posted on the building, even though the mailed letter containing the order was returned marked "unclaimed."   [690]

The owner of a dilapidated, fire damaged building in Boston, who had due notice of an order to him by the building commissioner under § 116 (d) of the Boston building code, St. 1938, c. 479, to the effect that the building must be razed by the owner as "unsafe and dangerous" within seven days after the date of the order or it would be razed by the commissioner, and who failed to avail himself of his remedies of appeal and review under §§ 118 and 119 of the code, could not subsequently attack collaterally the propriety of the commissioner's determination that the building was "unsafe and dangerous" and should be razed when that determination was relied on in defence of an action for trespass by the owner against a contractor who, after the expiration of the time allowed the owner by the commissioner, razed the building under a contract with the city.   [692–693]

In a contract between a city and a contractor for razing of a dilapidated, fire damaged building whose owner had failed to raze it as ordered by the city's building commissioner, a provision that the contractor should remove from the premises "all materials" as his property referred to materials constituting the building and not to certain building materials stored on the premises by the owner; and the contractor would be liable to the owner for conversion if the stored materials were not abandoned by the owner and were removed and appropriated by the contractor.   [693–694]

TORT.   Writ in the Superior Court dated October 1, 1958.

The action was tried before *Goldberg,* J.

*Morris Michelson,* for the plaintiff.

*Irving Goodman,* for the defendant.

CUTTER, J. Two counts in this action of tort were tried: count 7 for trespass and damage to real estate, on which there was a verdict for the defendant (Wrecking), and count 8 for conversion of personal property on which the plaintiff (DiMaggio) had a verdict. The action, originally brought also against the city of Boston (the city) and its building commissioner (the commissioner), was discontinued against them. DiMaggio's exceptions are to the denial of requested instructions in connection with count 7 and to the instructions given. Wrecking's exceptions are to the denial of motions for a directed verdict and for a new trial on count 8.

DiMaggio owned the land and a fire damaged building at 19 Linwood Street, Roxbury. Wrecking razed the building under a contract with the city. It defended its action on the ground that the commissioner had ordered the building demolished under the Boston building code, St. 1938, c. 479, § 116 (d).[1] Related sections of c. 479 are set out in the margin.[2] Cf. G. L. c. 143, §§ 6, 8, 9, as amended; *Silverblatt* v. *Livadas, ante,* 474, 478–480. See as to an earlier statute applicable to Boston, *New England Trust Co.* v. *Boston,* 300 Mass. 321, 326–329. The commissioner had examined the

---

[1] Section 116 (d) reads in part: ". . . [E]very building which is . . . unsafe shall be made safe or removed; or every such building shall be vacated forthwith on order of the commissioner, with the approval of the mayor. Such order shall be in writing and shall be addressed and delivered, or mailed, postage prepaid, to the owner or tenant, if he is known and can be found, or otherwise by posting an attested copy of the order in a conspicuous place upon an external wall of the building, and shall state the conditions under which the building may again be used or occupied. . . . If in the opinion of the commissioner the public safety so requires the commissioner, with the approval of the mayor, may at once enter the building or other structure which he finds unsafe . . . with such assistance as he may require, and make safe or remove said unsafe . . . building . . . and may protect the public . . . otherwise as may be necessary . . . ."

[2] Section 118 (a) provides that a "person . . . ordered by the commissioner to incur expense may . . . appeal therefrom [to the board of appeal existing under § 117] within thirty days of the date of such order, except that, in case of a building . . . which, in the opinion of the commissioner, is unsafe . . . the commissioner may in his order limit the time for such appeal to a shorter period." By § 119 (a) the board of appeal existing under § 117, after a hearing, may "vary the application of any provision of this code to any particular case when in its opinion the enforcement thereof would do manifest injustice, provided that the decision of the board shall not conflict with the spirit of any provision of this code." Paragraphs (b), (c), and (e) of § 119 permit the board to reverse or modify the commissioner's order. Under § 119 (f) a person aggrieved by the board's decision may have it reviewed by a "writ of certiorari to correct errors of law in such decision." See G. L. c. 249, § 4.

property about December 17, 1956, and found the building to be unsafe and dangerous. Photographs of the premises which form part of the record show a very dilapidated shell of a part brick, part wood house with many broken, unboarded windows, and a roof apparently partly open to the skies. The house was close to a brick building (which in photographs looks like an apartment house) and reasonably could have been regarded as a fire, and perhaps vermin, risk if allowed to remain in this state long.

A notice dated December 31, 1956, was mailed by certified mail on that day to DiMaggio at 201 Hampden Street, Roxbury, where he lived, referring to § 116 (d), stating as reasons for the notice, "Building badly gutted by fires. Roof destroyed, first floor partially destroyed. Beyond normal repair. To remedy this condition: Raze building. Unless this unsafe and dangerous condition shall have been corrected by 12 noon, January 7, 1957, the . . . commissioner . . . will . . . raze the structure. The cost of this work will be billed to the owner and will become a lien on the property." The letter containing the notice was returned marked "unclaimed." "When the letter . . . came back . . . [the head of construction and safety in the building department] tried to telephone" DiMaggio "but never went to . . . [his] home or office or to any job that he was on." A copy of the notice was posted on the building at 19 Linwood Street. Permission of the mayor to make the building safe or to remove it was obtained.

Wrecking submitted a bid for the work of destroying the building after one of its officers examined it. This officer testified that he found in the basement "rubble, paper, charred timbers, [and] rubbish." It received a contract for this work, under which Wrecking agreed "to raze the building and remove all materials from the premises, . . . materials to become . . . [its] property." Demolition was started on January 28 and completed on January 31. Wrecking removed "all materials from the premises." One of its officers testified that "none of the material of the building came to . . . [its] yard as it was worth nothing."

DiMaggio testified that he had stored heavy lumber and other building materials worth $5,087.32 in the heavily padlocked basement of the building for the purpose of remodelling the building and for his general work. He found the padlock unbroken and still intact in the debris remaining after the demolition of the building, indicating to him that they "couldn't open the lock. They had to break . . . around it." There was evidence from which it could have been found that there was no danger that the building would tumble down and that there had been only smoke damage to the outside structure and bearing walls. DiMaggio had purchased the building after a fire to remodel it, had "cleaned out the building, boarded it up, and put roof rafters in the roof, but didn't repair the roof."

1. With respect to count 7, DiMaggio requested the judge to instruct the jury that the "adjudication by the building commissioner that the building should be demolished is not conclusive and his order to demolish it is no defence if in fact public safety did not require it to be demolished." The judge did not give this instruction but, instead, after outlining the steps required by § 116 (d), said that if these were "done and the city then makes a contract with a wrecking company to tear the building down, then the wrecking company which tears it down after such compliance with the statute is justified in tearing it down and there is no liability on the city or the wrecker." [3]

We take judicial notice of all the provisions of St. 1938, c. 479, a public act of the Legislature of general application in Boston. See *Brodsky* v. *Fine,* 263 Mass. 51, 54; *Davenport* v. *Danvers,* 332 Mass. 580, 581. See also *Forbes* v. *Kane,*

---

[3] He also said, "Whether the building is actually unsafe . . . is not the test and is immaterial. It is not a question thereafter whether the building was actually unsafe or not. The test is: was the building commissioner of the opinion that this action should be taken and was the notice sent to owner or was a notice posted on the outside of the building and did the mayor approve? If those things are done, then the wrecking company or the person who does the wrecking of the building is justified. . . . The burden of proof is on . . . the wrecking company, to satisfy you by the fair weight of the credible evidence that it was justified in tearing the building down. It was justified if the statute was complied with with respect to those matters that I have just discussed with you."

316 Mass. 207, 210. On the evidence, the jury could have found that there had been proper compliance with the procedural provisions of § 116 (d), not excluding the requirement of notice, even if the notice was mailed and not received. See *Durkin* v. *Siegel, ante,* 445, 447–448. The giving of notice by mailing and posting was expressly authorized by the section. The question for decision thus is whether the propriety of the commissioner's judgment that the building was unsafe may be attacked collaterally and retried in this action against one carrying out the commissioner's decision.

DiMaggio relies, to establish the propriety of his requested instruction, primarily upon *Miller* v. *Horton,* 152 Mass. 540.[4] See *Stone* v. *Heath,* 179 Mass. 385, 387–388; *North Am. Storage Co.* v. *Chicago,* 211 U. S. 306, 314, 317–320; *New Hampshire Fire Ins. Co.* v. *Murray,* 105 F. 2d 212, 216–218 (7th Cir.). See also *Belmont* v. *New England Brick Co.* 190 Mass. 442, 446; *Stiles* v. *Municipal Council of Lowell,* 233 Mass. 174, 182–183. Cf. *Burofsky* v. *Turner,* 274 Mass. 574, 580–582; *Jaffarian* v. *Murphy,* 280 Mass. 402, 405–408. Cf. also *Commonwealth* v. *Sisson,* 189 Mass. 247, 252–253 (as to quasi legislative action). *Miller* v. *Horton* dealt with St. 1887, c. 252, § 13, which authorized certain commissioners "in all cases of . . . glanders . . . having condemned the animal infected therewith . . . [to] cause such animal to be killed without an appraisal." A bare majority of this court decided that the commissioners' determination that a particular horse had the glanders was not conclusive and that the issue might be retried in an action against those who killed the horse pursuant to the order. It was said by

---

[4] Authorities discussing *Miller* v. *Horton* and similar decisions are collected in Harper and James, Torts, §§ 29.8–29.10; Davis, Administrative Law (1958 ed.) §§ 25.13, 26.05 (severely critical of the decision); Parker, Administrative Law, 27, 34, 132, 203; Jennings, Tort Liability of Administrative Officers, 21 Minn. L. Rev. 263, 282, 291; Gray, Private Wrongs of Public Servants, 47 Calif. L. Rev. 303, 325; Brown, Use of Extraordinary Legal and Equitable Remedies, 22 B. U. L. Rev. 55, 90–91; Lewis, Finality of Findings of Fact in Regulation of Public Health and Professions in Massachusetts, 21 B. U. L. Rev. 696. See also Prosser, Torts (2d ed.) § 25, § 109, at pp. 782–784; Parker, Execution of Administrative Acts, 24 Chi. L. Rev. 292, 301. Cf. Jaffe, Judicial Review: Constitutional and Jurisdictional Fact, 70 Harv. L. Rev. 953, 967.

Holmes, J. (at p. 548) that the "jurisdiction of the commissioners to condemn the . . . horse under § 13 was conditional upon its actually having the glanders. . . . [T]heir order would not protect the defendants in a case where the commissioners acted outside their jurisdiction."

Statute 1887, c. 252, contained no requirement of notice to the owner of the horse. It gave no reasonable opportunity for a hearing at any stage, or for an appeal and review of the commissioners' decision by an independent administrative board, or for a court review on questions of law. The 1938 Boston building code, on the other hand, contains the provisions already summarized (see footnote 2, *supra*) affording to the owner an appeal to, and a right to be heard before, the board of appeal. The court review on questions of law by certiorari, under G. L. c. 249, § 4 (as amended through St. 1953, c. 586, § 1), includes the opportunity "to contend . . . that the evidence which formed the basis of the action complained of or the basis of any specified finding or conclusion was as matter of law insufficient to warrant such action, finding or conclusion." See *Tracht* v. *County Commrs. of Worcester,* 318 Mass. 681, 686–687. The 1938 building code is thus in material respects distinguishable from the 1887 statute. This is essentially the distinction of *Miller* v. *Horton,* based upon the right to be heard and appropriate review, outlined by Brandeis, J., dissenting in *Crowell* v. *Benson,* 285 U. S. 22, 89, fn. 24. There may be some suggestion of a similar reasoning in *Stevens* v. *Worcester,* 219 Mass. 128, 130–131, *Stevens, landowner,* 228 Mass. 368, 373, and *Chase* v. *Proprietors of Revere House,* 232 Mass. 88, 96–97. See *Yakus* v. *United States,* 321 U. S. 414, 433–443. See also Annotation 14 A. L. R. 2d 73, 82, 88–90. Cf. *Durgin* v. *Minot,* 203 Mass. 26, 28–31. We thus need not consider whether *Miller* v. *Horton* will now be followed on its precise facts. Certainly, in recent cases, it has not been considered on the issue of its basic holding. See e.g. *Trum* v. *Paxton,* 329 Mass. 434, 438–439; *Sullivan* v. *Commonwealth,* 335 Mass. 619, 628–629. By the Boston building code the Legislature, acting within the police power, has

given broad jurisdiction (cf. *Forbes* v. *Kane,* 316 Mass. 207, 215–216) to the commissioner to determine this matter (i.e. whether particular buildings are unsafe) affecting the public health and safety. The jurisdiction is subject, however, to statutory safeguards against its unreasonable exercise, designed to satisfy the requirements of due process. His jurisdiction depends not upon his being right in his decision but upon the legislative grant to him of power to decide the matter subject to the statutory review.

It will be time enough to consider the scope and adequacy of the statutory safeguards when one entitled to do so invokes this protection. Cf. *Opinion of the Justices,* 328 Mass. 679, 682–685, 687–690. DiMaggio did not pursue his statutory remedies. Even though he may not have done so because he did not receive the statutory notice, we find no basis for any contention that the notice did not comply with the 1938 statute or that the statute did not make provisions for notice adequate to meet requirements of due process. See *Mullane* v. *Central Hanover Bank & Trust Co.* 339 U. S. 306, 318–320; *Walker* v. *Hutchinson,* 352 U. S. 112, 115–116; *Hanson* v. *Denckla,* 357 U. S. 235, 245. Cf. *Covey* v. *Somers,* 351 U. S. 141, 146–147.

The administrative determination of the building commissioner, subject as it is to the provisions of §§ 118 and 119 (see footnote 2, *supra*), cannot be the subject of collateral attack in this action. The person whose property is destroyed because it is dangerous to the public health and safety, if he seeks damages for the destruction, must show that his administrative remedies were availed of seasonably and exhausted. Those acting in good faith under an order, while it is in effect unattacked, are entitled to rely upon it without making, at their peril, a determination whether the commissioner's conclusion was correct. The ability of a civil officer to place reliance upon a warrant, issued by a court within the area of its usual jurisdiction and valid on its face, may provide an analogy. See *Morrill* v. *Hamel,* 337 Mass. 83, 85–87.

The notice gave DiMaggio at least until January 7, 1957,

to comply with the order or to appeal from it. This, in effect, was notice under § 118 (a), see footnote 2, *supra*, to DiMaggio that, if he was going to appeal, he ought to do so before the case became moot by reason of the commissioner's action in razing the building.[5] The notice has not been shown to have been unreasonably short notice in the circumstances. Certainly one buying or owning a building in such shape had reasonable ground to expect that public authorities soon might require its prompt rehabilitation or removal.

The trial judge correctly charged the jury on count 7. DiMaggio's requested instruction on that count was properly denied.

2. The evidence on the conversion count 8, if believed, would warrant a finding that DiMaggio left new building materials, some of them heavy timbers, worth over $5,000 locked in the basement of the building, and that, to reach these materials, it was necessary to break down the basement door or walls. Although it is obvious that the jury did not believe either that all the materials, for which DiMaggio made claim, had been placed on the property, or that Wrecking had taken them for its own, the jury could reasonably have found on the evidence that at least the heavy timbers were placed on the premises, that these timbers were not pilfered by others, and that they were removed by Wrecking.

The new building materials could have been found to have been no part of the building fabric. In that case they would hardly be within the definition of "all materials" which were to become Wrecking's property as a part of the compensation for its destruction of the building. The term "all materials" in context must be taken to refer to materials

---

[5] This is not a case where the commissioner moved so rapidly to destroy DiMaggio's building after giving the statutory notice that, even if the notice had been received, the opportunity for a hearing on the commissioner's notice would be unavailing. Accordingly, we need not decide what finality would be given to immediate emergency action which, under § 116 (d), the commissioner may take, if in his "opinion . . . the public safety so requires." Even in such a case there may be considerations of public policy which might lead to permitting reliance, without independent investigation, upon the commissioner's order by those reasonably attempting to execute it in good faith. See authorities collected in footnote 4, *supra*.

constituting the building rather than to building materials and other personal property stored on the premises. The plaintiff does not argue that the contract for destruction of the building, the cost of which was to be charged to DiMaggio, did not reasonably provide for Wrecking to take over the material in the building fabric to reduce the cost of the contract to DiMaggio. Section 116 (d) specifically authorized the removal of the building structure (see footnote 1, *supra*). Nothing in § 116 (d), however, authorized the city to take over DiMaggio's personal property, if any, stored on the premises. We assume that the city could have removed this property and stored it for DiMaggio at his expense, at least until its abandonment could reasonably be inferred. Upon this record a finding of such abandonment was not required as a matter of law. We have not been referred to any statutory authority for the confiscation of such property. See *Morrison* v. *Howe*, 120 Mass. 565, 572, where building materials were held for its owner by public officers under a somewhat comparable statute. See also analogy of *Cogliano* v. *Commonwealth*, 334 Mass. 354, 359–360. A verdict could not have been directed for Wrecking on count 8.

3. Even if Wrecking can be said to have argued its exception to the denial of its motion for a new trial on count 8, there was no error. This was a matter within the trial judge's discretion. No abuse of discretion has been shown.

*Exceptions overruled.*